JEANNE K. ZWICK, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Zwick v. Commissioner
Docket No. 1529-87
United States Tax Court
T.C. Memo 1990-389; 1990 Tax Ct. Memo LEXIS 405; 60 T.C.M. (CCH) 267; T.C.M. (RIA) 90389; July 25, 1990, Filed *405 Decision will be entered under Rule 155. Jeanne K. Zwick, pro se. Robert W. Towler, for the respondent. PARR, Judge. PARR
*406 MEMORANDUM OPINION Respondent determined deficiencies in income tax and additions to tax as follows: Additions to Tax
Year
Deficiency
Sec. 6653(b) [1]
1976
$  31,117.00
$ 15,558.50
1977
61,349.38
30,674.69
1978
175,294.62
87,647.31
Respondent conceded at trial and on brief that petitioner is not liable for the additions to tax under section 6653(b). He has also conceded that petitioner's deficiencies are not greater than the following amounts: Year
Deficiency
1976
$  8,132.00
1977
20,536.64
1978
48,462.25
The questions presented are: 1. Whether the statute of limitations bars assessment against petitioner for 1976, 1977, and/or 1978. This turns on a finding of whether petitioner's former husband, Howard A. Zwick ("Zwick"), committed fraud *407 in those years. 2. Whether respondent's determination as to the following items of income for petitioner and Zwick were correct: Item
1976
1977
1978
Income from
$ 48,816.10
$ 86,015.95
$ 52,070.79
Bartering -- MTC
Accommodation
1,455.42
2,922.20
2,346.35
Sales -- MTC
Diverted Cash
600.00
10,400.00
17,276.00
Sales -- MTC
Travel received
1,104.00
272.00
105.77
from Bartering
Capital Gains
1,528.00
13,357.00
-0- 3. To what extent, if any, petitioner is relieved from liability by virtue of being an "innocent spouse" under section 6013(e). [2]
Petitioner resided in San Anselmo, California, when she filed her petition in this case. For convenience we will make findings of fact and opinion on an issue by issue basis. *408 Statute of Limitations
Petitioner was married to Howard A. Zwick during the years in issue. They subsequently divorced. Petitioner and Zwick timely filed joint Federal individual income tax returns (Forms 1040) for 1976, 1977, and 1978. On May 19, 1977, the Zwicks filed an amended income tax return (Form 1040X) for 1976. Both petitioner and her husband signed each return. Neither petitioner nor Zwick signed a consent to waive the statute of limitations for any of the years in issue. Thus, under section 6501(a) the statute of limitations would ordinarily have expired as follows: 1976
1977
1978
May 19, 1990
April 15, 1981
April 15, 1982
The notice of deficiency upon which this case is based was mailed to petitioner on October 16, 1986. However, section 6501(c)(1) provides for an unlimited period for assessment for a year in which any part of a deficiency is due to fraud on the part of either spouse. Vannaman v. Commissioner, 54 T.C. 1011 (1970). After a jury trial Zwick was convicted on September 14, 1984, of income tax evasion under section 7201 for 1977 and 1978. The United States Court of Appeals for the Ninth Circuit affirmed *409 the conviction, and the Supreme Court denied certiorari. Zwick is thus estopped from denying fraud for 1977 and 1978. Stone v. Commissioner, 56 T.C. 213, 223 (1971). However, petitioner is not estopped. To establish that section 6501(c)(1) applies to hold the statute of limitations open, respondent must prove by clear and convincing evidence that some part of a deficiency for each year is due to fraud on the part of one of the spouses. Stone v. Commissioner, supra.
The evidence in this case clearly and convincingly establishes that some part of the deficiency for each of the years 1976, 1977, and 1978 was due to fraud by Howard Zwick. Indeed, petitioner does not seriously contest that her former husband committed tax fraud. Zwick was a former radio station general manager who in 1975 organized Media Trade Company, Inc. ("MTC"), a corporation, to act as a middleman between radio stations and advertisers. Zwick was the sole shareholder of MTC. MTC, which had offices in San Francisco, accumulated advertising time from radio stations nationwide. MTC then sold the advertising time for cash, or bartered the time for goods or services from advertisers. *410 MTC accumulated additional radio advertising time from radio stations by bartering goods or services with radio stations. In 1976 through 1978 Zwick built a luxurious Mexican-style hacienda on 10 acres in Kenwood, California. A portion of the materials and services used in construction were MTC's accumulated assets. In addition, Zwick had MTC use its cash to obtain goods and services for him from advertisers-clients of MTC. Zwick also deposited checks made out to MTC (or which were given in payment for MTC's goods or services) into bank accounts that served his personal purposes. Further, Zwick took personal trips, obtained from MTC's advertiser-clients by the use of MTC's assets. This diversion of corporate assets led to a net omission of taxable income of $ 21,146.85 in 1976, $ 34,241.19 in 1977, and $ 25,756.61 in 1978. Zwick's course of conduct was in all material respects the same in each of those years. His failure to report these substantial amounts of income, coupled with the fact that the omissions were done regularly and over a three-year period, convinces us that a part of the deficiency in each year is attributable to Zwick's fraudulent intent to evade tax in *411 each of these three years. Rogers v. Commissioner, 111 F.2d 987, 989 (6th Cir. 1940), affg. 38 B.T.A. 16 (1938); Smith v. Commissioner, 32 T.C. 985, 987 (1959); Galant v. Commissioner, 26 T.C. 354, 365 (1956); Vassallo v. Commissioner, 23 T.C. 656, 663 (1955). We therefore hold that, because of the fraud committed by petitioner's husband, the statute of limitations has not expired as to petitioner for any of the years in issue. Income Items
Respondent determined the following items of income had been omitted by petitioner and her former husband: Item
1976
1977
1978
Income from
$ 48,816.10
$ 86,015.95
$ 52,070.79
Bartering -- MTC
Accommodation
1,455.49
2,922.20
2,346.35
Sales -- MTC
Diverted Cash
600.00
10,400.00
17,276.99
Sales -- MTC
Travel received
1,104.00
272.00
105.00
from Bartering
Capital Gains
1,528.00
13,357.00
-0-
After concessions by respondent, and based upon the testimony at trial, we find there was a net omission of income attributable to the above items as follows: Item
1976
1977
1978
Income from
$ 42,293.69
$ 68,482.37
$ 51,513.22
Bartering -- MTC
Accommodation
-0-  1,202.11
1,073.57
Sales -- MTC
Diverted Cash
600.00
10,400.00
17,276.00
Sales -- MTC
Travel received
1,104.00
272.00
105.00
from Bartering
Capital Gains
1,528.00
13,357.00
-0- *412 Except for capital gains, all the items above were proposed for inclusion because they represented distributions of corporate assets. Respondent therefore conceded at trial that they could be included as ordinary income only if they reflected earnings and profits of MTC. Otherwise, such amounts would be either return of capital or capital gains income. For this purpose, respondent's concessions and/or the evidence show as follows: Howard Zwick owned all the shares of MTC. His contribution to the capital of MTC was $ 3,000. There were no accumulated or current earnings and profits in 1976 and 1977. In 1978 current earnings profits were $ 50,396.30. Respondent conceded at trial that petitioner is entitled to reduce the amounts of constructive distributions for which she is held liable by the full amount of reimbursements as follows: 1976
$  3,522.31
1977
17,533.58
1978
557.57
Respondent also conceded on brief (page 7) that petitioner is entitled to an interest expense deduction of $ 4,685 which was disallowed in the statutory notice. Respondent also conceded at trial that petitioner is entitled to a dividend exclusion of $ 100 in each of the years *413 in issue. However, petitioner is not entitled to a $ 3,000 capital loss deduction which would otherwise be available, because it relates to a $ 155,000 ordinary income item in 1978 for which respondent conceded petitioner is not liable. Innocent Spouse Relief
The next issue for decision is whether petitioner qualifies for relief from liability under section 6013(e)(1) from the deficiencies and additions to tax attributable to the income items redetermined above. Section 6013(e)(1) provides: (1) In General. -- Under regulations prescribed by the Secretary, if -- (A) a joint return has been made under this section for a taxable year, (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse, (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement,
then the other spouse shall be relieved *414 of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement.
The requirements of section 6013(e)(1) are conjunctive, rather than alternative. Thus, a failure to meet any of them prevents a spouse from qualifying for relief. Estate of Killian v. Commissioner, T.C. Memo. 1987-365.Petitioner has the burden of proving entitlement to innocent spouse relief. Rule 142; Purcell v. Commissioner, 86 T.C. 228, 235 (1986), affd. 826 F.2d 470 (6th Cir. 1987). Entitlement to innocent spouse relief can be considered on an item by item basis. Purcell v. Commissioner, supra at 235 n.3. In reaching our conclusions, we recognize that section 6013(e) was designed to remedy an injustice, and that it ought to be construed with that in mind. Allen v. Commissioner, 514 F.2d 908, 915 (5th Cir. 1975). Petitioner's adjusted gross income for 1985 was $ 13,367. See section 6013(e)(4). Petitioner filed a joint return. Grossly Erroneous Items -- Capital Gains
Respondent concedes that there *415 is a substantial understatement of tax attributable to grossly erroneous items of Zwick, except for the capital gains adjustment. We thus turn now to the question of whether the adjustment relating to capital gains is a grossly erroneous item, within the meaning of section 6013(e)(1)(B) and section 6013(e)(2)(A). The capital gains adjustments arose from the sale of jointly owned income-producing properties in 1976 and 1977. The Zwicks erroneously added to their cost basis, for purposes of computing gain on the sale, expenses they had already deducted in prior years. Petitioner does not contest the accuracy of the adjustment. The capital gains adjustments are not grossly erroneous items attributable solely to Mr. Zwick. Because she was a joint owner, failure to accurately report the gain on the sale of the real estate is an item attributable to petitioner. She, therefore, cannot be relieved of liability for the deficiency as to those amounts. She is jointly liable with Zwick for the understatements of tax attributable to the $ 1,528 and $ 13,357 of capital gains for 1976 and 1977. See Botsaris v. Commissioner, T.C. Memo. 1988-438. Petitioner's Knowledge *416 Petitioner must prove that she did not know, and had no reason to know, of the substantial understatements of tax liability due to the grossly erroneous items. Sec. 6013(e)(1)(C). A spouse has "reason to know" of the substantial understatement if a reasonably prudent taxpayer in her position at the time she signed the return could be expected to know that the return contained the substantial understatement. Price v. Commissioner, 887 F.2d 959 (9th Cir. 1989); Stevens v. Commissioner, 872 F.2d 1499, 1505 (11th Cir. 1989). Petitioner was married to Howard Zwick for 14 years, including the years in issue. They wed in 1968, separated in 1981, and divorced in 1984. After three months of marriage Zwick insisted that petitioner resign her job as a secretary to become a full-time homemaker. She did not work outside the home again until 1979, when she performed part-time secretarial duties for Zwick's company in an office on the Kenwood property. The job lasted about one year. In 1973 Zwick formed MTC in San Francisco. MTC began in a one-room office with Zwick and a secretary, but quickly grew during the next five years. Petitioner was appointed *417 Secretary of the Board of Directors, but her only function was to attend two or three meetings at an attorney's request. Petitioner went into the office only a few times during the year, since she was at home caring for a baby. Moreover, Zwick did not want petitioner involved in the business, nor did he want her to come into the city because he was having affairs with other women. Many of the MTC assets taken by Zwick for personal purposes were luxurious trips and expensive gifts for women with whom Zwick was having affairs. Petitioner was unaware of these expenditures. During the years of the marriage Zwick neither allowed petitioner to see any of his paychecks nor to make any bank deposits to any accounts. Only two bank account registers were accessible to petitioner, her personal account and a household account. Zwick paid the major bills for the house; petitioner wrote checks for food or personal items. Only Zwick had the combination to the family safe, where he kept records of personal expenditures charged to MTC in "the Kenwood book." Petitioner knew of the book in a vague way, but did not have access to it and did not post in it. Zwick usually kept at least one *418 drawer of the home file cabinet locked. Once, in late 1975 or early 1976, petitioner got into a drawer left unlocked and found Zwick had forged her name to a finance company loan for $ 10,000. She became very angry, notified the finance company never to let Zwick sign her name again, and temporarily left Zwick over the incident. Petitioner was afraid to question MTC employees about the business. Zwick opened 97 percent of the mail, and all of the bank statements. Zwick paid the bills and filed them away. Zwick prepared the income tax returns. He did not go over them with petitioner, other than to tell her they had a refund coming back. Petitioner and Zwick lived a luxurious lifestyle, which ended in bankruptcy after Zwick's conviction and imprisonment. This lifestyle began well before the years in issue, as Zwick's business grew more successful. In 1974 or 1975 they took a cruise to Hawaii with their son. They owned two condominiums in Hawaii. They owned investment real estate including a duplex, a large home in Kentfield, California, a house on Greenberry Lane, and a house in Lucas Valley. They traveled widely for pleasure. In 1978 petitioner had a Rolls Royce, which *419 Zwick acquired at a bargain from a client car dealer on the verge of bankruptcy. In 1976 Zwick and petitioner began construction of a very luxurious home in Kenwood, California. Zwick originally believed construction would cost about $ 350,000. However, as the plans became more and more elaborate, the project eventually cost around $ 1.2 million. The Zwicks put in a little over $ 1,000,000 cash (including loans), and approximately $ 200,000 in trade (barter) at retail value (including the MTC assets charged in the notice of deficiency). The house was completed around 1980. Petitioner was initially opposed to building the house, because she was satisfied with the house she already had. But Zwick became obsessed with building the house, and petitioner was eventually swept up in the excitement. She helped design the house, supervised much of the construction, and selected the furnishing in Mexico, for which the Zwicks paid cash. Petitioner had no idea Zwick was using any MTC assets to pay for the construction. Petitioner reasonably believed the money for construction of the Kenwood house was coming from bank and personal loans and from the sale of the couple's income property. *420 Indeed, $ 1,000,000 of the total $ 1.2 million cost did come from these legitimate sources. Furthermore, Zwick exerted near total control over the couple's financial affairs. The extent of petitioner's participation was to accept money from him to use to pay household expenses and to purchase the family's food and clothing. She relied on Zwick to ensure that their Federal income tax returns were properly completed. Considering the fragile and strained relationship that petitioner maintained with Zwick, and her limited access to financial records, we conclude that petitioner neither knew, nor had reason to know, of the substantial understatements contained in the returns. Equitable Considerations
Finally, we must ascertain whether, under all the facts and circumstances, it is inequitable to hold petitioner liable for the deficiencies attributable to the understatements. Sec. 6013(e)(1)(D). One relevant factor is whether the spouse benefited significantly from the grossly erroneous items that caused the deficiency. Normal support is not a significant benefit. Sec. 1.6013-5(b), Income Tax Regs.; Terzian v. Commissioner, 72 T.C. 1164, 1172 (1979).Normal *421 support is the lifestyle to which one has become accustomed. Sanders v. United States, 509 F.2d 162, 168 (5th Cir. 1975). Another factor relevant to the equity determination is whether the spouse seeking relief has been deserted by or divorced or separated from the other spouse. Sec. 1.6013-5(b), Income Tax Regs.
Petitioner and Zwick moved to the Kenwood property in 1976 to begin construction. They lived on the property in an apartment over a barn until the house was complete enough for them to occupy in October or November 1978. Zwick's corporation needed $ 500,000, primarily due to the failure of some accounts it had, and Zwick was liable for the bills. He borrowed $ 500,000 from a bank, using the Kenwood home as a guarantee on the note. All of the money went into MTC. The company could not make the 22 percent interest payments, and in 1982 MTC went into involuntary bankruptcy. When that happened, Zwick filed for Chapter 11 to keep the Kenwood home from being sold. Petitioner did not declare bankruptcy. In 1981 Zwick and petitioner separated. In 1982 the house was offered for sale for $ 5,250,000. However, it did not sell. Finally, the bankruptcy *422 trustee sold it in 1983 for $ 1,750,000. While the property was for sale, petitioner continued to live there with her son, in order to keep the place from deteriorating and to show it until it was sold. Petitioner's divorce was final in 1984. Petitioner received nothing from the Hawaiian condominiums, which were sold in bankruptcy. From the sale of the Kenwood house, petitioner received only a $ 45,000 homestead, minus $ 17,000 attributable to Zwick's half of the furniture. Although petitioner lived in the house rent free while waiting for it to be sold, this was not a pleasure. She testified: I lived there three months without electricity. I had one small plus thing, I go put back on, hot-wired as you might put it in the workshop, and I cooked out there in the workshop, and I lived in the house for three to four years [sic] without heat.
Petitioner was forced to sell personal jewelry, including her grandmother's ring, to keep the electricity turned on and the 19 horses fed until they could be sold. She kept records for the trustee, made the pool repairs, learned to drive a tractor and mowed the ten acres of lawn herself, fed and cared for the *423 horses, and showed the house. She spent hours each day on these tasks. She personally incurred $ 38,000 of expenses, for which she was never reimbursed, despite the trustee's promises that she would be repaid. Petitioner described the financial results of her life with Zwick as follows: The mortgages were paid off with my community property half, because all of my community property half went to pay attorney fees of Howard's after divorce, the trustee and the attorney, and the IRS. So that's where my community property half went, and then I didn't even get back my own money that I put in. So I ended up with $ 5,200, which I owe my aunt, and I have not received support from Howard at all. I received it for four months in 1983, some alimony, and I'm supposed to get $ 2,000 a month. And so that's basically what I've ended up with out of the house.
Petitioner's reference to the money she contributed was to her payments on their original house in Mill Valley, which was sold to help pay for the Kenwood house. She testified she had paid half the down payment on that house with savings from before her marriage and a stock fund she began at age 17. She was not reimbursed *424 for any of this. Under the circumstances, we find that, taking into account all the facts and circumstances, it is inequitable to hold petitioner liable for the deficiencies in tax for the years in issue. We therefore hold that, under section 6013(e), petitioner is entitled to the relief accorded to an innocent spouse as to all "grossly erroneous" items. She is not entitled to such relief, however, as to the adjustments attributable to capital gains. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Respondent concedes all other issues raised in the notice of deficiency. The amounts shown above also represent respondent's concessions as to certain items, i.e., accommodation sales 1976, and travel from bartering, all years.↩