T.C. Memo. 1996-69

UNITED STATES TAX COURT

NANCY SILVERMAN AND ESTATE OF SHELDON SILVERMAN,
DECEASED, NANCY SILVERMAN, EXECUTRIX, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 20324-89.                Filed February 20, 1996.

H invested $100,000 in an arrangement, as a result of
which a $1,600,000 Schedule C deduction was claimed on the
1981 tax return.  W did not see or sign this tax return, but
the parties agree that it was a joint tax return.  As a
result of H's income tax withholding and excess F.I.C.A.
withholding, H's and W's 1981 joint tax return reported
payments of $128,733, all of which was claimed as a refund.
In September 1982 respondent (R) refunded $74,360.39 plus
interest by check, which H deposited in one of his
individual checking accounts, and quickly spent.  At the
same time, R transferred the remaining $54,372.61 of 1981
payments to H's and W's 1980 tax liability account, leaving
a zero balance in the 1980 tax liability account.  H died in
1986, and his estate was insolvent.  Later in 1986, W filed
claims for refund of 1979, 1980, and 1981 taxes, on account
of net operating loss carrybacks from 1982.  (A similar
$1,600,000 Schedule C deduction had been taken on H's and

W's 1982 joint tax return.)  R abated $55,923 of H's and W's 1980 tax liability, which (with interest, etc.) resulted in W's receiving a refund check totalling $128,715.36 in 1988.

1.  <u>Held</u>:  The 1981 grossly erroneous item (the $1,600,000 deduction) is an item of H.  Sec. 6013(e)(1)(B), I.R.C. 1954.

2.  <u>Held</u>, <u>further</u>, when the tax return was signed, W did not know, and had no reason to know, that there was a substantial understatement of tax for 1981.  Sec. 6013(e)(1)(C), I.R.C. 1954.

3.  <u>Held</u>, <u>further</u>, in 1988 W received a substantial benefit from the 1981 grossly erroneous item (the $54,372.61 that had been transferred from the 1981 account to the 1980 account), and so it is not inequitable to hold W liable for the substantial understatement of 1981 tax resulting from that grossly erroneous item.  Sec. 6013(e)(1)(D), I.R.C. 1954.

<u>Gary S. Weinick</u>, for petitioners.

<u>Halvor N. Adams III</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHABOT, <u>Judge</u>:  Respondent determined deficiencies in Federal individual income tax and additions to tax under sections 6659[1] (valuation overstatements) and section 6661 (substantial understatement of liability) against petitioners as follows:

| | | Additions to Tax | |
|---|---|---|---|
| Year | Deficiency | Sec. 6659 | Sec. 6661 |

---

[1]    Unless indicated otherwise all section references are to sections of the Internal Revenue Code of 1954 as in effect for 1981.

| | | | |
|---|---|---|---|
| 1981 | $185,361 | $55,608 | --- |
| 1982 | 27,232 | 8,170 | [1]$6,808 |

[1] Determined as alternative to sec. 6659 addition to tax.

Respondent also determined that interest on the entire deficiencies for 1981 and 1982 is to be computed under section 6621(c).

After concessions,[2] the issue for decision is whether petitioner Nancy Silverman qualifies as an innocent spouse under section 6013(e) with respect to the 1981 tax deficiency.

FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

When the petition was filed in the instant case, petitioner Nancy Silverman (hereinafter sometimes referred to as Nancy) resided in Cincinnati, Ohio. The will of Sheldon Silverman (hereinafter sometimes referred to as Sheldon) was admitted to probate in the Surrogate's Court for Bergen County, New Jersey, and that Court appointed Nancy as Executrix of Sheldon's estate.

Background

[2] Respondent has conceded all the additions to tax. Petitioners have conceded the deficiencies, the increased interest under sec. 6621(c), and petitioner Nancy Silverman's ineligibility for innocent spouse status for 1982.

Nancy and Sheldon were married on August 25, 1974, and they remained married and lived together until Sheldon's death on August 9, 1986. They had two children by this marriage--Joseph, born in 1978, and Melanie, born in 1980. Both Nancy and Sheldon had earlier marriages that ended in divorce in 1974. Sheldon had a child from his earlier marriage--Lee, born in 1967. From 1974 through 1986 Sheldon made $250 weekly alimony payments to his former wife. Nancy did not receive alimony from her former husband; she did receive about $30,000 (the balance in her and her former husband's joint bank account) at or around the time of her divorce. At the time of her divorce, Nancy also received corporate stock worth about $8,000-9,000 from her employer's profit-sharing plan. In addition, she had her car and personal items such as clothing.

Nancy was born and grew up in Cincinnati, Ohio. She received a B.A. degree in English literature from the University of Cincinnati in 1964. Nancy got married in 1962, while she was a junior in college. Her first husband also was a college student at that time. Nancy worked part-time while she was a student, and after graduation she worked full-time in a department store. Nancy and her first husband filed joint tax returns during their marriage. These tax returns were fairly simple, especially those for the years when Nancy and her first husband were students. Nancy's first husband prepared their tax

returns, and Nancy signed them after they were prepared.  Nancy filed for divorce in 1973, and the divorce became final in March 1974.  In 1974, after her divorce, Nancy moved to the New York, New York, area, intending to work in that city.  She did not get a job in New York--instead she met and married Sheldon.  At this time Sheldon was already an established and successful businessman; he was a part owner of one of the largest junior dress manufacturers, Dawn Joy.

After Nancy and Sheldon were married, Nancy moved into Sheldon's New York apartment, and spent her days decorating the apartment, learning her way around New York, taking tennis lessons, dining with friends, and going to the theater.  In 1975 Nancy and Sheldon jointly bought, and in 1976 moved into, a house in Demarest, New Jersey.  The purchase price was $135,000, for which they took out a $75,000 purchase money mortgage.  This house was their home throughout the rest of their married life. Nancy's and Sheldon's comfortable lifestyle remained significantly the same throughout their marriage.

Nancy and Sheldon had a "traditional" marriage.  Sheldon was the breadwinner-businessman, and Nancy was the home-manager, or "housewife".  Sheldon took care of the finances and made all of the investment decisions, as he had done before their marriage. Sheldon separated business from home; he conducted all business from his office in Manhattan.  Sheldon did not have an office in

their home; he did not do any "paperwork" at home. Sheldon took his mail, which Nancy separated from her mail, and which Nancy did not open, into his office. While he was a part owner in Dawn Joy, Sheldon kept his books and records at Dawn Joy's office rather than at his home. Sheldon insisted upon this; this was Sheldon's longstanding policy as to how he managed his activities.

Nancy was in charge of the household; for example, she bought furniture, food, and other household items, and she paid for nursery school, utilities, the mortgage on their New Jersey home, gardening, and clothing. She paid for these items out of her and Sheldon's joint checking account in the United Jersey Bank (hereinafter sometimes referred to as the Joint Account). See infra table 7. The money that Nancy needed to handle the household finances came from Sheldon. The amounts she received fluctuated, depending on what Nancy told Sheldon she needed in order to replenish the Joint Account. Much of the time she received about $3,000 to $3,500 per month. Nancy did not work outside the home during her marriage to Sheldon.

During 1981 Nancy and Sheldon had two vehicles, a 1978 Jeep Wagoneer and a 1978 Stutz Blackhawke Coupe. Both of these vehicles were left at home for Nancy to use. Sheldon also had a leased car. The Stutz had been leased by Sheldon for 3 years and, in 1981, he exercised his "buyback" privilege and bought the

Stutz for $13,800, for Nancy's use. Nancy bought the Jeep new in 1977 for $11,495; Sheldon gave her the money to pay for it.

Sheldon bought furs and jewelry for Nancy. Sheldon and Nancy took vacations, including the following: (1) Five days, Aruba, Jan. 1978; (2) 7 days, France and Monte Carlo, July 1979; and (3) 5 days, Antigua, Aug. 1981.

Nancy and Sheldon jointly owned a house in Cincinnati, Ohio. Nancy's sister had been unable to qualify for a mortgage loan on this house, so Nancy and Sheldon took out the mortgage loan. Nancy's sister sent checks to Nancy, to reimburse Nancy for the mortgage payments. When Sheldon died, the Cincinnati house was worth $40,000 and was encumbered with a $22,000 mortgage.

Sheldon had open heart surgery in 1977 at age 34; he died on August 9, 1986.

Business Activities

Both before and during his marriage to Nancy, Sheldon conducted his business activities from his office at Dawn Joy. Nancy was not involved in Sheldon's business activities. Occasionally Nancy visited Dawn Joy socially. Nancy usually stayed in the showroom portion of the facilities. She did not know specifically where Sheldon's business records were kept, and she did not look at these records.

Sheldon, Sheldon's father, and Martin Stein (hereinafter sometimes referred to as Stein) began Dawn Joy in 1969. In June

of 1982, after Sheldon's father died, Sheldon and Stein disagreed about the direction of the business, and so Sheldon sold his interest in Dawn Joy to Stein for $750,000.  Nancy knew of this sale before it took place.  Sheldon received wage and salary income from Dawn Joy in the amounts of $182,000 for 1981 and $87,483.34 for 1982.  After the sale of his interest in Dawn Joy, Sheldon remained involved in the garment industry as an employee and investor.

In April 1981 Sheldon backed another dress business, Royal Green Fashions.  Nancy knew at the time it was happening that Sheldon was backing this business.  There were two "working partners" of Royal Green Fashions, and Sheldon was the "financial partner".  On their 1982 tax return, Nancy and Sheldon reported that Nancy received $5,700 wage and salary income from R & L Fashions, a company from which Sheldon had received $63,300 in wage and salary income in 1982.  However, Nancy had not done any work for R & L Fashions, and was not aware of the Form W-2 and the fact that she and Sheldon reported the income.

After Sheldon's death, in late 1986, all of Sheldon's business records (contained in about 30-40 boxes), which had been at his various places of business, were delivered to Nancy.  It was at this time that Nancy first had access to, and first saw Sheldon's records.

Betty Sverdlik (hereinafter sometimes referred to as Sverdlik) was the office manager/controller at Dawn Joy from about 1970 to May 1981. Charlotte Weiss (hereinafter sometimes referred to as Weiss) handled accounts payable at Dawn Joy. Sverdlik helped Sheldon keep his personal books and records. Sverdlik wrote checks (that Sheldon signed) to pay bills, made telephone calls, and took care of whatever came up. Sverdlik began to work for Sheldon's father in 1963, and performed many of the same tasks for Sheldon's father before she began to work for Dawn Joy. Around the time Sverdlik left Dawn Joy, Sheldon instructed her to train Weiss so that Weiss could take care of Sheldon's personal bookkeeping. After Sverdlik left Dawn Joy, Weiss assisted Sheldon with his personal bookkeeping.

Investing and Gambling Activities

Sheldon invested in racehorses (pacers and trotters) before and throughout his marriage to Nancy. Nancy was generally aware of Sheldon's investments in horses, although she was not involved in the decision-making. She went to the track with Sheldon to see the horses race. Sheldon sometimes mentioned to Nancy the names of horses he owned, or was buying. After Sheldon's death Nancy spent more than $40,000 to wind up Sheldon's horse business, because the business was not viable without Sheldon to manage it. Sheldon gambled on the horses at the racetrack, and

gambled at various casinos.  Sheldon owed $84,000 to casinos at his death.

In 1981 Sheldon signed a series of documents, dated December 15, 1981, with Crude Associates, purportedly a Florida partnership.  Each of these documents relates to State Coal Venture, hereinafter sometimes referred to as State Coal.  One document, entitled "Second Sublease", purports to obligate Sheldon to pay $1,600,000 to Crude Associates, by paying $60,000 in cash and $1,540,000 in a promissory note on or before December 30, 1981; the document further purports to require Sheldon to make a $40,000 principal payment on the note on or before January 31, 1982.  The other documents are the promissory note, a security agreement, an operating agreement, and a first sublease between Load Associates and Crude Associates.  Sheldon is named in, and he signed, each of these documents except for the first sublease.  Nancy is not named in, and did not sign, any of these documents.  Nancy did not see any of these documents until late 1986, after Sheldon died.  Sheldon made the 1981 payment by three checks ($25,000, $15,000, and $20,000) and the 1982 payment by one check ($40,000), all to an escrow account.  These checks were drawn on Sheldon's individual checking accounts at Bankers Trust and Chemical Bank.  See infra table 7.  Sheldon made all the payments that were made on this investment.  The entire

$1,600,000 of purported obligation was deducted on Sheldon's and Nancy's 1981 tax return.

The attorney who marketed State Coal had met Nancy during social occasions, but never discussed State Coal with her, and Nancy was never present when the attorney discussed State Coal with Sheldon. Sheldon did not tell Nancy of this investment until late 1985, during a discussion about tax problems.

Nancy did not have signature authority on either of the checking accounts that Sheldon used to make his State Coal payments. Nancy never wrote any checks to the firm that marketed State Coal, or any checks to anyone to buy an interest in State Coal.

Nancy did not know of the State Coal investment or the $1,600,000 deduction on the 1981 tax return until a long time after the 1981 tax return was signed and filed.

Tax Returns and Refunds

Nancy filed joint Federal income tax returns with Sheldon from 1974 through 1982. The 1981 tax return was filed on August 21, 1982. Table 1 shows the signature dates for the tax returns from 1979 through 1982.

Table 1

| Tax Year | Signature Date |
| --- | --- |
| 1979 | June 11, 1980 |
| 1980 | Oct. 9, 1981 |
| 1981 | May 21, 1982 |
| 1982 | Mar. 9, 1984 |

Nancy filed tax returns as "married filing separately" from 1983 through 1985. She did this because (1) Sheldon told her that the Federal Government owed him a large refund, and he was not going to file tax returns until he received this refund, and (2) R & L Fashions issued a 1983 Form W-2 reporting wage income in Nancy's name.[3] Nancy filed her 1983 and 1984 tax returns on or about November 15, 1985, and her 1985 tax return on July 14, 1986. On her 1983 tax return she reported $15,600 in wages, etc., income and $1,509 in interest income from the Joint Account. On her 1984 and 1985 tax returns she reported $1,601 and $2,046, respectively, in interest income from the Joint Account. These are the only income items Nancy reported on her tax returns for 1983, 1984, and 1985.

Nancy was not involved in the preparation of her joint income tax returns during her marriage with Sheldon. Sheldon had accountants prepare their joint tax returns, and then he brought the tax returns home for Nancy to sign. The 1974 through 1980 joint tax returns were prepared by the firm of Zelon, Septimus & Co. Sheldon had been using this firm to prepare his tax returns at least since 1967. The 1981 and 1982 tax returns were prepared by the firm of Spahr, Lacher, Berk & Naimer. Nancy signed the

---

[3] When Nancy received the R & L Fashions Form W-2 for 1983, she questioned Sheldon about it. Sheldon explained that another partner's wife had been put on the R & L Fashions payroll, and so Nancy was also put on the payroll to equalize the compensation of the partners.

joint tax returns for 1974 through 1980 and for 1982. On the joint tax returns for 1979, 1980, and 1982, Nancy signed as "Nancy Silverman".

Sheldon did not bring the 1981 tax return home for Nancy to sign, and although this tax return was signed with Nancy's name (shown as "Nancy Jane Silverman"), Nancy did not sign this tax return. Nancy did not realize that she had not signed the 1981 tax return, because (1) she had two small children to attend to, (2) she did not contribute to the tax return preparation, and (3) Sheldon's and Nancy's tax returns were usually filed with extensions of time, and were not usually signed at the same time every year. See supra table 1. The tax return preparer's signature on the 1981 tax return is dated May 20, 1982; the "Nancy Jane Silverman" signature on this tax return is dated May 21, 1982. At the time the 1981 tax return was filed, Nancy was unaware of any tax problems regarding Sheldon, or his businesses, or their joint tax returns. Nancy did not review the 1981 tax return before it was filed; she did not see it until after Sheldon died.

Pertinent information that petitioners reported on their 1981 through 1984 tax returns is shown in table 2.

Table 2

| | 1979 | 1980 | 1981 | 1982 |
|---|---|---|---|---|
| Wages, etc. | $491,400 | $428,700 | $340,200 | $169,983 |
| Interest income, before exclusion | 5,508 | 5,806 | 6,501 | 29,752 |
| Dividends, before exclusion | 571 | 380 | 33 | 74 |
| Sched. C | --- | --- | (1,600,000) | (1,612,952) |
| Capital gain or (loss) | (3,000) | (3,000) | -0- | 185,065 |
| Sched. E | (4,926) | 56,333 | 1,933 | (106,899) |
| Other items | 26,494 | 12,813 | 6,748 | (186,901) |
| | (20,000) | 4,213 | (7,800) | (22,250) |
| | (7,800) | (7,500) | | |
| | | (7,800) | | |
| Adjusted gross income | 488,047 | 489,845 | (1,252,785) | (1,544,202) |
| Total tax liability | 186,676 | 204,868 | -0- | -0- |
| Total payments | 196,494 | 163,828 | 128,733 | 34,436 |
| Balance due (Refund claimed) | (9,818) | 41,040 | (128,733) | (34,436) |

The $1,600,000 1981 Schedule C deduction (hereinafter sometimes referred to as the State Coal royalty deduction) and $1,600,000 of the 1982 Schedule C deduction arose from State Coal.  The Schedule C for each of these years shows Sheldon's name and Social Security number, and does not show Nancy's name or Social Security number.  The Schedule C net loss for each of these years ($1,600,000 for 1981, $1,612,952 for 1982) appears on the first page of the Form 1040.

Table 3 shows Sheldon's 1981 wages, Federal income tax withholding, and F.I.C.A. tax withholding.

Table 3

| Payor | Wages | Withholding Taxes | |
| | | Fed'l Inc. | F.I.C.A. |
| --- | --- | --- | --- |
| Dawn Joy | $182,000 | $62,715.94 | $1,975.05 |
| Lucky Fashions | 70,200 | 28,446.12 | 1,975.05 |
| Lyon Fashion | 52,400 | 16,975.76 | 1,975.05 |
| AMS Industries | 35,600 | 14,670.00 | 1,975.05 |
| | 340,200 | 122,807.82 | 7,900.20 |

Of the F.I.C.A. taxes withheld, $5,925.15 is excess, and is treated as an income tax payment on the 1981 tax return.

The 1981 tax return includes a claim for refund of $128,733--$122,808 withholding and $5,925 F.I.C.A. taxes withheld.

On or about September 24, 1982, the U.S. Treasury issued to Sheldon and Nancy an $81,054.77 tax refund check on account of 1981.[4]  Of this amount, $6,694.38 was interest and $74,360.39 was tax.  Petitioners reported $6,798 interest from the U.S. Treasury on their 1982 tax return.  The remaining $54,372.61 of the $128,733 claimed refund was transferred to Nancy's and Sheldon's 1980 tax liability account, as further described, infra, in connection with table 6.  Sheldon deposited the $81,054.77 check into his individual checking account at Chemical Bank.  See infra table 7.  Within 2½ weeks, Sheldon had written checks against this bank account aggregating more than the entire deposited tax

--------

[4]   The check is dated Sept. 24, 1982, a Friday, but respondent's transcript of account for 1981 shows that the transaction is posted as of Sept. 27, 1982, a Monday.

refund check. Nancy first became aware of this tax refund after Sheldon's death, probably in early 1987.

In 1984 the U.S. Treasury issued to Sheldon and Nancy a $25,540.14 tax refund check on account of 1982. Sheldon deposited this check into the same bank account as the earlier refund check. Substantial withdrawals were not made from this bank account until about 2 months after this deposit.

During the period December 11, 1980, through December 13, 1984, the balance in this Chemical Bank checking account fluctuated substantially. Table 4 illustrates these fluctuations by showing the bank account balances (rounded to the nearest dollar) on selected dates.

Table 4

| Date | Amount | Date | Amount |
|------|--------|------|--------|
| 12/11/80 | $11,108 | 03/23/83 | $17,344 |
| 12/31/80 | 609 | 06/10/83 | 56,248 |
| 03/04/81 | 41,311 | 06/28/83 | (69,274) |
| 04/20/81 | 5,681 | 12/15/83 | 61,755 |
| 09/11/81 | 27,792 | 01/12/84 | 5,083 |
| 11/09/81 | 4,726 | 02/14/84 | 123,621 |
| 05/07/82 | 165,572 | 02/17/84 | 14,247 |
| 06/17/82 | 12,730 | 03/09/84 | 103,005 |
| 06/18/82 | 514,327 | 04/09/84 | (990) |
| 07/08/82 | 3,737 | 05/09/84 | 33,926 |
| 09/28/82 | 97,864 | 07/23/84 | 3,253 |
| 12/10/82 | 11,338 | 07/27/84 | 46,023 |
| 12/20/82 | 361,221 | 12/03/84 | 989 |

On September 8, 1986, Nancy filed amended joint tax returns for 1979, 1980, and 1981, claiming refunds of previously paid taxes, as shown in table 5. On these amended tax returns, Nancy

claimed that the refunds arose from a net operating loss generated in 1982, which is carried back to 1979 and then carried over to 1980 and 1981.  The calculations on the amended tax returns begin with the $1,544,202 negative adjusted gross income shown on the 1982 tax return.  See supra table 2.

Table 5

|  | 1979 | 1980 | 1981 |
|---|---|---|---|
| Net operating loss deduction | $1,217,535 | $807,632 | $330,099 |
| Refund claimed | 186,676 | 204,868 | 74,209 |

Table 6 shows information as to 1980 liabilities and payments, as reflected on the 1980 tax return, the 1980 amended tax return, and respondent's records.

Table 6

| Item | 1040/1040X Reported Amount | Respondent's Records Amount |
|---|---|---|
| Total tax liability | $204,868 | $204,868.00 |
| Withholding and excess F.I.C.A. payments | 163,828 | 163,828.00 |
| Balance due | 41,040 | 41,040.00 |
| Adjustments--Nov. 16, 1981 | --- | 5.00 |
| | | 4,104.00 |
| | | 1,231.20 |
| | | 2,900.91 |
| Adjustments--Sept. 27, 1982 | --- | 820.80 |
| | | 3,039.49 |
| | | 1,334.43 |
| | | (103.22) |
| Balance without transfer | --- | 54,372.61 |
| Transfer 1981 to 1980 | --- | 54,372.61 |
| Balance due | --- | -0- |
| Amended tax return refund requested | 204,868 | --- |
| Refund paid for 1980 | --- | 128,715.36 |
| Components: | | |
| (1) abatement of 1980 tax | --- | 55,923.00 |
| (2) abatement of penalty | --- | 2,052.00 |
| (3) abatement of previously assessed interest | --- | 5,940.40 |
| (4) interest on overpayment | --- | 64,799.96 |

By April 15, 1982, taking into account additions to tax and accrued interest, the 1980 tax liability of $41,040 had grown to $54,372.61.

As of September 27, 1982, respondent transferred $54,372.61 out of Sheldon's and Nancy's 1981 tax liability account and into their 1980 tax liability account. This was done in connection with the September 1982 issuance of the $81,054.77 tax refund check for 1981, described supra, but the transfer was recorded on respondent's records as of April 15, 1982. After this transfer, the balance in Sheldon's and Nancy's 1980 tax liability account was zero.

After Nancy filed the amended tax return for 1980 claiming a $204,868 refund, respondent abated the 1980 income tax liability, but only to the extent of $55,923. This abatement then triggered a refund of tax for 1980 in the amount of $128,715.36. This refund consisted of (1) a tax decrease in the amount of $55,923, (2) an abatement of penalty in the amount of $2,052, (3) an abatement of interest previously assessed in the amount of $5,940.40, and (4) interest on the overpayment in the amount of $64,799.96. The refund check for 1980, in the amount of $128,715.36 was issued on February 5, 1988, and was received by Nancy.

Bank Accounts, Life Insurance, Etc.

During 1981 Nancy and Sheldon held various bank accounts and owned stock, as shown in table 7. Sheldon's two individual checking accounts were in existence at the time Nancy and Sheldon got married. Nancy did not have signature authority on any of

Sheldon's individual accounts.  Sheldon's records for these bank accounts were kept at his office; Nancy did not have access to these records.

Table 7

| Bank or Stock | Type of Account | Account Holder |
|---|---|---|
| Peoples Trust[1] | savings | Sheldon/Nancy as trustees for Lee |
| Peoples Trust[1] | savings | Nancy as trustee for Joseph |
| Peoples Trust[1] | savings | Sheldon/Lee--joint |
| Chemical Bank | savings | Sheldon/Nancy as trustees for Lee |
| Chemical Bank | savings | Sheldon/Nancy as trustees for Melanie |
| Chemical Bank | savings | Sheldon/Nancy as trustees for Joseph |
| AT&T stock | custodial | Nancy as custodian for Lee |
| AT&T stock | custodial | Nancy as custodian for Joseph |
| United Jersey[2] | checking | Sheldon/Nancy--joint |
| Peoples Trust[1,3] | savings | Sheldon/Nancy--joint |
| Chemical Bank | checking | Sheldon |
| Bankers Trust | checking | Sheldon |

[1]  The parties' stipulations indicate that these accounts are in Peoples Trust. However the stipulated exhibits indicate that at some point, perhaps before 1981, Peoples Trust (or at least the branch in which these accounts were maintained) became United Jersey.
[2]  This is the Joint Account.
[3]  On this record we cannot determine whether the deposits in this account came in whole or in part from Sheldon.  We cannot determine whether Nancy or Sheldon made the withdrawals.  By mid-1977 the account had a balance of $39,764.41.  By Jan. 24, 1980, after deposits of $300 and $320.26, interest had caused the balance in the account to climb to $46,301.10.  On Jan. 24, 1980, $15,000 was withdrawn from the account.  On Feb. 1, 1982, $25,000 was withdrawn from the account, leaving a balance of $10,120.97.

When Sheldon died, Nancy received the proceeds from life insurance policies as shown in table 8.  Three of these policies were originally owned by Dawn Joy as part of a key-man buyout program.  At the time Sheldon left Dawn Joy, Dawn Joy allowed Sheldon to take over these policies.

Table 8

| Policy # | Date Issued | Amount Received by Nancy |
|----------|-------------|--------------------------|
| 2190403 | 06/17/64 | $14,458 |
| [1]25-727 | 02/01/72 | 100,919 |
| [1]28-813 | 06/01/73 | 100,740 |
| 1071929 | 04/01/75 | 100,442 |
| 1069919 | 04/01/75 | 50,250 |
| 1096151 | 03/05/79 | 24,507 |
| 1096152 | 03/17/79 | 75,463 |
| [1]8013005 | 12/22/80 | 489,163 |
| 3614323 | 11/22/83 | 175,773 |
| 001337321 | --- | 473,050 |
| | | 1,604,765 |

[1] Policies originally owned by Dawn Joy.

The 1982 premiums on the first eight policies listed in table 8 aggregated about $16-17,000; these policies provided almost $1,000,000 of the proceeds that were paid to Nancy. The record does not permit us to determine when policy number 001337321 was issued, nor how much the premiums cost.

The Estate

Sheldon's probate estate was insolvent. The estate tax return showed that there was no estate tax liability. Respondent agreed and issued a closing letter to this effect.

At Sheldon's death, in addition to the life insurance, discussed supra, Nancy received Sheldon's interest in their jointly owned Franklin Federal Tax Free Income Fund (valued at $250,011) by operation of law. Also, in October of 1985 Nancy received Sheldon's interest in their jointly owned home in New Jersey. The home was valued at $650,000 on Sheldon's estate tax

return; the remaining mortgage debt ($57,000) was shown on the estate tax return as being entirely Sheldon's debt. Nancy sold the home for $730,000 in August 1988. After payment of the remaining mortgage debt, sales commission, and other expenses, Nancy received about $625-630,000 on this sale. Nancy spent considerable amounts in winding up Sheldon's affairs, as follows: Legal fees, $40,000; funeral expenses, $10,000; accounting expenses, $15,000; and horse expenses, $40,000.

Notice of Deficiency

The entire deficiency determined for 1981, which petitioners have conceded (supra note 2), is attributable to the State Coal royalty deduction.

_____

If Sheldon and Nancy had filed separate tax returns for 1981, then the State Coal royalty deduction would have been on Sheldon's tax return and not on Nancy's tax return. The State Coal royalty deduction claimed on Nancy's and Sheldon's 1981 tax return is an item of Sheldon.

Nancy did not know, and did not have reason to know of the substantial understatement of tax on the 1981 tax return.

Nancy significantly benefited from the State Coal royalty deduction claimed on the 1981 tax return; it is not inequitable to hold Nancy liable for the deficiency in tax resulting from this substantial understatement.

OPINION

Section 6013(a) permits a husband and wife to elect to file a joint tax return. Together with section 1(a), this joint tax return option is a valuable privilege, which ordinarily operates to lower the tax liability for the income reported on the tax return. The price taxpayers must pay for this benefit is joint and several liability. Sec. 6013(d)(3); Stevens v. Commissioner, 872 F.2d 1499, 1503 (11th Cir. 1989), affg. T.C. Memo. 1988-63; Murphy v. Commissioner, 103 T.C. 111, 117 (1994); Bokum v. Commissioner, 94 T.C. 126, 151-152 (1990), affd. 992 F.2d 1132 (11th Cir. 1993); Pesch v. Commissioner, 78 T.C. 100, 129-130 (1982).

Under section 6013(e),[5] however, a spouse may be relieved of

---

[5] Sec. 6013(e) provides, in pertinent part, as follows:

SEC. 6013. JOINT RETURNS OF INCOME TAX BY HUSBAND AND
            WIFE.

* * * * * * *

(e) Spouse Relieved of Lability in Certain Cases.--

(1) In general.-- Under regulations prescribed by the Secretary, if--

(A) a joint return has been made under this section for a taxable year,

(B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse,

(C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and

(continued...)

this joint liability for a year if certain requirements are met for that year.  The putative innocent spouse must show the following:  (1) A joint income tax return was filed for the year (sec. 6013(e)(1)(A)); (2) on this tax return there is a substantial understatement of tax (sec. 6013(e)(1)(B)); (3) this substantial understatement of tax is attributable to grossly erroneous items (sec. 6013(e)(1)(B)); (4) the grossly erroneous items are items of the other (the putative "guilty") spouse (sec.

---

5(...continued)

> (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement,

> then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement.

> (2) Grossly erroneous items.--For purposes of this subsection, the term "grossly erroneous items" means, with respect to any spouse--

> > (A) any item of gross income attributable to such spouse which is omitted from gross income, and

> > (B) any claim of a deduction, credit, or basis by such spouse in an amount for which there is no basis in fact or law.

Although the year before us is 1981, we apply the statute as amended in 1984, because section 424(a) of the Deficit Reduction Act of 1984 (DEFRA), Pub. L. 98-369, 98 Stat. 494, 801, amended sec. 6013(e) retroactively to all open years to which the Internal Revenue Code of 1954 applies.  Sec. 424(c)(1) of DEFRA, 98 Stat. at 803.

6013(e)(1)(B)); (5) when the tax return was signed the putative innocent spouse did not know, and had no reason to know, that there was this substantial understatement of tax (sec. 6013(e)(1)(C)); and (6) it is inequitable to hold the putative innocent spouse liable for the tax deficiency that is attributable to this substantial understatement of tax.  Sec. 6013(e)(1)(D).  Also (as elements of item (3), supra), if any such item is a claim of deduction, credit, or basis, then the putative innocent spouse must show that the claim has no basis in fact or law (sec. 6013(e)(2)(B)); and the tax liability for these items must exceed a certain percentage of the putative innocent spouse's income for the preadjustment year, in the instant case, 1988.[6]  Sec. 6013(e)(4); Hayman v. Commissioner, 992 F.2d 1256, 1260 (2d Cir. 1993), affg. T.C. Memo. 1992-228; Bokum v. Commissioner, 94 T.C. at 138, 992 F.2d at 1133-1134.

---

[6]    The preadjustment year is "the most recent taxable year * * * ending before the date the deficiency notice is mailed." Sec. 6013(e)(4)(C).  The notice of deficiency was mailed on May 26, 1989; thus 1988 is the preadjustment year.  Nancy's 1988 income was increased by her profit on the sale of the New Jersey home.  This increase in Nancy's 1988 income was enough to disqualify her from innocent spouse treatment for 1982 (deficiency of $27,232), but not for 1981 (deficiency of $185,361).  Because the parties agree that the preadjustment year substantiality requirement is enough to disqualify Nancy from innocent spouse treatment for 1982, we do not consider whether she failed to meet any of the other requirements as to 1982.

The spouse seeking relief has the burden of proof on each of these requirements. Rule 142(a);[7] <u>Purcell v. Commissioner</u>, 826 F.2d 470, 473 (6th Cir. 1987), affg. 86 T.C. 228 (1986); <u>Bokum v. Commissioner</u>, 94 T.C. at 138. Because the statute is phrased in the conjunctive, failure to prove any one of the requirements will prevent the taxpayer from qualifying for relief. <u>Hayman v. Commissioner</u>, 992 F.2d at 1260; <u>Purcell v. Commissioner</u>, 826 F.2d at 475 n. 6; <u>Bokum v. Commissioner</u>, 992 F.2d at 1134, 94 T.C. at 138.

These factors, taken together with the well-established principle that exemptions from taxation are to be narrowly construed, place a significant burden on the taxpayer. <u>United States v. Stewart</u>, 311 U.S. 60, 71 (1940); <u>Matthews v. Commissioner</u>, 907 F.2d 1173, 1174, 1178 (D.C. Cir. 1990), affg. 92 T.C. 351, 361 (1989); <u>Bokum v. Commissioner</u>, 94 T.C. at 155, and cases there cited.

The parties agree that the following requirements have been satisfied: (1) Nancy and Sheldon filed a joint tax return for 1981;[8] (2) the understatement of tax on the tax return is substantial; (3) the substantial understatement of tax is

---

[7]    Unless indicated otherwise, all rule references are to the Tax Court Rules of Practice and Procedure.

[8]    The parties have stipulated that the 1981 tax return was a joint tax return, even though Nancy did not sign it, and we have so found. See <u>Estate of Campbell v. Commissioner</u>, 56 T.C. 1, 12-14 (1971), and cases there cited.

attributable to a deduction that had no basis in fact or law; (4) this deduction is a grossly erroneous item; and (5) in accordance with the requirements of section 6013(e)(4), the understatement exceeds the required percentage of Nancy's 1988 income.

Still in dispute is whether Nancy satisfies the following requirements: (1) The State Coal royalty deduction is an item of Sheldon; (2) at the time the 1981 tax return was signed Nancy did not know, and had no reason to know, of the substantial understatement of tax; and (3) it is inequitable to hold Nancy liable for the deficiency. We consider these disputed matters seriatim.

## A. Item "of" Sheldon

Respondent contends that petitioners have failed to prove that Nancy did not write any checks to buy the interest in State Coal, and thus that petitioners have failed to prove that the State Coal royalty deduction is an item of Sheldon. Petitioners contend that Nancy played no role in the decision to buy the interest in State Coal, that Nancy's name does not appear on any document purporting to grant an interest or impose an obligation regarding State Coal, and that the total amount required to buy the interest in State Coal was paid by Sheldon from his individual accounts.

We agree with petitioners.

We have found that Sheldon signed a series of documents in 1981 purporting to give Sheldon an interest in State Coal and purporting to impose obligations on Sheldon. Nancy is not named in any of these documents, did not sign any of these documents, and did not see any of these documents until late 1986, after Sheldon died. The second sublease purports to obligate Sheldon to pay $60,000 in cash and $1,540,000 in a promissory note on or before December 30, 1981, and to make a $40,000 principal payment on the promissory note on or before January 31, 1982. Sheldon paid the $60,000 and the $40,000 by checks drawn on his separate accounts, and he signed the promissory note. On the 1981 tax return, the $1,600,000 disallowed deduction is claimed on Schedule C, which shows Sheldon's name and Social Security number and does not show Nancy's name or Social Security number. If Sheldon and Nancy had filed separate tax returns for 1981, then the disallowed deduction would have been on Sheldon's tax return and not on Nancy's tax return. We conclude, and we have found, that the item from which Nancy seeks innocent spouse relief is an item "of" Sheldon, within the meaning of section 6013(e)(1)(B). Bokum v. Commissioner, 94 T.C. 140.

On brief, respondent asserts that "It is uncertain whether the four checks were the total payment for the interest in State Coal because no evidence was offered of the total amount of the

investment."  The four checks in question match the obligations purportedly imposed on Sheldon.  We have no reason to believe that any additional payments were required to be made or were made.  Respondent does not suggest that (1) any other witnesses or books and records might show any other payments, or (2) that Nancy had a source for making any other payments.  We reject respondent's attempts to create uncertainty by making unfounded speculations, and then to capitalize on that uncertainty by invoking Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

Petitioners have convinced us, and we have found, that Sheldon made all the payments that were made.  We do not see the loose ends that respondent speculates about.  We believe that the instant case does not provide a proper basis for invocation of the Wichita Terminal doctrine.

We hold for petitioners on this issue.

B. Knowledge or Reason to Know

Respondent contends that Nancy's testimony "should not be relied upon" and that "it is likely that Mr. Silverman informed her of the investment in State Coal".  Respondent also contends that, even if Nancy did not in fact know of the State Coal investment, she should have known, because Nancy should be held to at least as high a standard of review of the tax return as would a taxpayer who had actually signed the tax return, and if

she had signed the tax return, then "she would have seen the $1,600,000 loss from State Coal claimed on the face of the return and noticed that the return reported zero tax liability."

Petitioners maintain that respondent vastly overstates Nancy's financial role in the Silverman marriage, and that Nancy's testimony about her lack of actual knowledge is reliable and uncontradicted. Petitioners also maintain that Nancy did not have any knowledge which should have led her to realize that there might be a tax problem and that she should ask Sheldon about it. Finally, petitioners maintain that respondent's focus on what Nancy would have seen if she had signed the 1981 tax return is irrelevant because in fact Nancy did not see and did not sign the 1981 tax return.

We agree with petitioners that Nancy did not know, and had no reason to know, of the understatement in tax.

In Bokum v. Commissioner, 94 T.C. at 148, we set forth our position as follows:

> The standard to be applied in determining whether a putative innocent spouse has "reason to know," under section 6013(e)(1)(C) is whether a "reasonably prudent taxpayer under the circumstances of the spouse * * * could be expected to know that the tax liability stated was erroneous or that further investigation was warranted." Stevens v. Commissioner, 872 F.2d at 1505 (fn. ref. omitted); Shea v. Commissioner, 780 F.2d 561, 566 (6th Cir. 1986), affg. on this issue and revg. on another issue * * * [T.C. Memo. 1984-310]. This standard applies to deduction, etc., matters, as well as income matters. 872 F.2d at 1505 n.8.

The lack of knowledge, as contemplated by section 6013(e)(1)(C), is not a mere lack of understanding of the tax consequences of a deduction or credit.  Hayman v. Commissioner, 992 F.2d at 1261; Stevens v. Commissioner, 872 F.2d at 1505 n.8; Purcell v. Commissioner, 826 F.2d at 474, 86 T.C. at 237-238; McCoy v. Commissioner, 57 T.C. 732, 734 (1972).

We first consider whether Nancy knew of the State Coal investment.  Nancy's testimony on this point is clear and credible.  The surrounding circumstances are consistent with her testimony.  Sheldon wrote the checks to pay for the State Coal investment on his individual checking accounts.  It was Sheldon's practice, both before and during his marriage to Nancy, to keep his business and investment activities separate from his home life.  The witness who dealt with Sheldon in the State Coal matter testified that, although he had met Nancy several times, he never mentioned State Coal to Nancy, and he never observed anyone else referring to State Coal in Nancy's presence.  Nancy's running of the Silverman household with money that Sheldon gave to her for this purpose is not inconsistent with Nancy's lack of knowledge about State Coal.  Nancy's service as custodian or trustee for the children's bank accounts or A.T.& T. stock account (see supra table 7) is not at all indicative of whether Nancy knew of State Coal by the time the 1981 tax return was signed.  Petitioners' burden on this limited point is merely to

persuade us that it is more likely than not that Nancy did not know of the State Coal investment by the time the 1981 tax return was signed; petitioners have clearly carried this burden of proof.

We next consider whether Nancy should have known of the State Coal investment.  Courts have considered several factors in deciding whether a taxpayer had reason to know of a substantial understatement of tax attributable to the grossly erroneous item (in the instant case, the State Coal deduction), including (1) the putative innocent spouse's level of education, (2) his or her involvement in the family's business and financial affairs, (3) the putative guilty spouse's evasiveness and deceit about the family's finances, and (4) the presence of lavish or unusual expenditures or any large unexplained increase in the family's standard of living.  Flynn v. Commissioner, 93 T.C. 355, 365-366 (1989).

Nancy received a B.A. degree in English literature from the University of Cincinnati in 1964.  Nancy was in charge of the household.  She paid for household items out of a joint checking account; the funds deposited into the account came from Sheldon. Nancy was generally aware of Sheldon's business and investment activities, and was aware of (1) Sheldon's sale of Dawn Joy interest before it took place, (2) Sheldon's Royal Green Fashion investment when it took place, and (3) Sheldon's investments in

horses.  She did not participate in these activities, except to occasionally visit Sheldon's garment business showroom or a race track where one of Sheldon's horses was running.  She did not participate in the decision-making.  Sheldon had several bank accounts in his own name, but Nancy did not have access to the records for these bank accounts.  Until 1985, Sheldon did not tell Nancy about the grossly erroneous item, or the State Coal investment that produced that item.  Also, Sheldon did not tell Nancy of the $81,054.77 tax refund check that he received on account of the grossly erroneous item, or that he deposited the check in one of his bank accounts, or that he made withdrawals that exceeded the deposited amount within about 2½ weeks after the deposit.  She did not learn of this until after Sheldon died.  Thus, as to most business and major investment matters, Sheldon neither hid nor volunteered what was happening, but clearly he hid the State Coal investment and its tax aftermath.  There was no lavish or unusual expenditure or large unexplained increase in the Silverman's standard of living at, or after, or in connection with, the State Coal investment or the tax refunds.  Unlike Sheldon's garment industry and horse racing activities, State Coal did not have any showrooms to visit or horse races to watch.

Apart from the 1981 tax return itself, we are satisfied on the record in the instant case that nothing occurred that should

have put Nancy on notice that there was a tax problem or that she should inquire as to whether there was a tax problem.

The 1981 tax return presents two difficulties for Nancy: (1) She did not sign it, and (2) if she had signed it, then she would or should have seen the $1,600,000 claimed deduction. As can be seen from table 2, supra, the $1,600,000 deduction and Schedule C loss, and the resultant minus $1,252,785 adjusted gross income, are far larger than any other amounts on the 1981 tax return, and several times as large as any amounts on the 1979 and 1980 tax returns that Nancy signed. See Bokum v. Commissioner, 94 T.C. at 147-148.

For whatever reason, Sheldon did not bring the 1981 tax return home for Nancy to sign, and, although the tax return was signed with Nancy's name, Nancy did not sign the 1981 tax return. Ordinarily, we would conclude that Sheldon's failure to present the 1981 tax return to Nancy for signing should, like "the incident of the dog in the night-time",[9] have alerted Nancy that

---

[9]    You consider that to be important? he asked.
       Exceedingly so.
       Is there any point to which you would wish to draw my attention?
       To the curious incident of the dog in the night-time.
       The dog did nothing in the night-time.
       That was the curious incident, remarked Sherlock Holmes.

Doyle, "Silver Blaze", Sherlock Holmes: The Complete Novels and Stories (vol. 1) 455, 472 (Bantam Books 1986).

something was wrong.  However, the evidence in the record of the instant case causes us to conclude that Nancy's failure to inquire is excusable under section 6013(e)(1)(C).  Nancy did not realize that she had not signed the 1981 tax return, because (1) she had two small children to attend to, (2) she did not contribute to the tax return preparation; and (3) Sheldon's and Nancy's tax returns were usually filed with extensions of time, and were not usually signed at the same time every year.  See supra table 1.

We do not suggest that a taxpayer who fails to sign a tax return is better off, for section 6013(e)(1)(C) purposes, than one who does sign the tax return.  The taxpayer must explain the failure, and must dispel any notion that he or she simply chose to turn a blind eye to--by preferring not to know of--facts fully disclosed on a tax return, of such a numerical magnitude as would reasonably put him or her on notice that further inquiry would need to be made.  Bokum v. Commissioner, 94 T.C. at 148.

On the totality of the instant case's record, we are satisfied that Nancy's failure to inquire about the 1981 tax return is reasonable.  In this circumstance, she did not see the tax return, and so it is understandable and excusable that the zero tax liability did not come to her attention and did not set off any alarms.

In light of these facts and circumstances, we conclude, and we have found, that Nancy did not know and did not have reason to know of the substantial understatement of tax for 1981.

We hold for petitioners on this issue.

## C. The Equities

Respondent contends that it is not inequitable to hold Nancy liable for the 1981 deficiency, because of the financial benefits Nancy received from Sheldon. In particular, respondent directs our attention to the following:

(1) Nancy came to the marriage with assets worth less than $50,000 and left it after Sheldon's death with assets worth more than $2.5 million, with "virtually all" of the increase having been "accumulated from Mr. Silverman's earnings."

(2) Less than 3 months after receiving and depositing the $81,054.77 tax refund check for 1981, Sheldon paid a $12,840 life insurance premium from that account on his life insurance policy 8013005. When Sheldon died, Nancy received a death benefit of $489,163 from that policy. See supra table 8.

(3) The claimed $1,600,000 loss deduction freed up $54,372.61 of Sheldon's 1981 income tax withholding to be applied to Sheldon's and Nancy's 1980 income tax liability,

and this resulted in the 1980 tax refund that Nancy received in 1988 being greater than it would otherwise have been.

Petitioners maintain that section 1.6013-5(b), Income Tax Regs., "disqualify a spouse for relief under Section 6013(e) only where the alleged benefit is derived from the omitted income and traceable to the omitted income (or deduction in this case)." They also maintain that (1) the New Jersey home was bought in 1976 from the funds not traceable to any refund of 1981 tax; (2) Nancy received only normal support, at a level attained before the 1981 tax refund; (3) the life insurance proceeds are not traceable to the 1981 tax refund; (4) the mortgage payments are properly treated as part of normal support at a level established before the 1981 tax refund; and (5) the tax refund that Nancy received in 1988 resulted from an abatement of 1980 tax liability that "had absolutely no relationship to the 1981 tax year."

We agree with respondent's conclusion and contention as to the tax refund Nancy received in 1988.

Under section 6013(e)(1)(D), Nancy is not entitled to innocent spouse treatment unless she can show that "taking into account all the facts and circumstances, it is inequitable to hold [her] *  *  * liable for the deficiency in tax *  *  * attributable to such substantial understatement".  This provision of the statute specifically directs us to take into account

equitable considerations in determining whether to grant immunity from joint and several tax liability.

One of the equitable considerations is "Whether the failure to report correctly tax liability results from `concealment, overreaching, or any other wrongdoing' on the part of the `guilty' spouse".  Hayman v. Commissioner, 992 F.2d at 1262 (quoting McCoy v. Commissioner, 57 T.C. at 735).  To the same effect, see Bokum v. Commissioner, 992 F.2d at 1134-1135.

In considering whether Sheldon understood what he was doing in taking the State Coal royalty deduction, we note the following:  (1) From at least 1967 through 1980, Sheldon used one firm to prepare his tax returns; the tax returns with the State Coal royalty deductions were prepared by a different firm.  (2) From 1974 through 1980, Sheldon showed the tax returns to Nancy and had her sign them; the first tax return with the State Coal royalty deduction was not shown to Nancy before it was filed, and was not signed by Nancy.  (3) As we pointed out supra, under B. Knowledge or Reason to Know, as to most business and major investment matters, Sheldon neither hid nor volunteered what was happening, but clearly he hid the State Coal investment and its aftermath; thus, as to this item there was a change in Sheldon's approach to disclosure to Nancy.  The foregoing leads us to conclude that Sheldon was a "guilty" spouse and there was concealment of the truth from Nancy.

Another of the facts and circumstances to be taken into account is whether Nancy significantly benefited from the substantial understatement of tax.[10]  Hayman v. Commissioner, 992 F.2d at 1262; Purcell v. Commissioner, 86 T.C. at 241.  In the instant deduction case we look at whether Nancy significantly benefited from the tax savings produced by the erroneous deduction.  Bokum v. Commissioner, 94 T.C. at 157.  Normal support is not a significant benefit.  Whether a benefit is significant is to be measured by the circumstances of the parties.  Hayman v. Commissioner, 992 F.2d at 1262; Purcell v. Commissioner, 86 T.C. at 242; sec. 1.6013-5(b), Income Tax Regs.

Nancy and Sheldon saved $185,361 in 1981 Federal income tax on account of the erroneous State Coal royalty deduction.  Because of withholding prepayments, $74,360.39 plus interest was returned to Nancy and Sheldon in September 1982 as a refund, and $54,372.61 was applied as a credit against Nancy's and Sheldon's 1980 tax liability, as of April 15, 1982.  The remaining $56,628

---

[10]    As we pointed out, supra, in the last paragraph of note 4, sec. 6013(e) was revised retroactively by sec. 424(a) of DEFRA. The 1984 amendments removed from the statute the language about significant benefit.  It is clear, however, from the legislative history that the rewording was not intended to remove from consideration whether the relief-seeking spouse benefited from the understatement of tax.  H. Rept. 98-432 (Part 2), 1501, 1502 (1984).  The conference committee agreement follows the House bill with two modifications, which are not applicable to this issue.  H. Conf. Rept. 98-861, at 1119-1120 (1984), 1984-3 C.B. (Vol. 2) 1, 373-374.

of the $185,361 correct 1981 tax liability (supra note 2) was not paid by or withheld from Nancy and Sheldon.

The tax refund check for 1981 was taken by Sheldon, deposited into one of Sheldon's individual checking accounts, and spent by Sheldon, all without Nancy's knowledge. That checking account balance fluctuated substantially; money flowed in and out in large amounts. See supra table 4.

How Sheldon spent this money (plus the $56,628 that he avoided payment of) is unclear, but Nancy's lifestyle did not change on account of the receipt of this refund and the avoided payment. We note that throughout their marriage Sheldon and Nancy had a comfortable lifestyle easily supported by Sheldon's earnings. See supra table 2. Up to the time of the 1981 tax return, Sheldon was a successful businessman who made a considerable amount of money. Sheldon's and Nancy's lifestyle included a New Jersey home, two cars, furs, jewelry, dining out, going to the theatre, and taking vacations.

Sheldon also gambled and invested. During 1981 and 1982 Sheldon spent $100,000 to invest in State Coal. At the time of his death he owed $84,000 to casinos. Sheldon owned racehorses, and he gambled on these horses. After Sheldon's death Nancy spent over $40,000 to wind up Sheldon's horse business.

Sheldon was a "key man" in Dawn Joy, and he had open heart surgery at age 34; he owned much life insurance. Substantially

all of Sheldon's life insurance policies were bought before the year in issue.

Sheldon's probate estate was insolvent, and Nancy spent more than $100,000 (including the horse business expenditures) in winding up Sheldon's affairs.  However, at or around the time of Sheldon's death Nancy received (1) about $1.6 million in life insurance proceeds (supra table 8), (2) Sheldon's interest, valued at about $125,000, in their Franklin Federal Tax Free Income Fund, and (3) Sheldon's interest in the jointly owned New Jersey home they bought in 1975.

Based on the foregoing, it is more likely than not, because of the circumstances of Sheldon's and Nancy's life, and because Sheldon made a considerable amount of money during his life, that the above items received by Nancy are normal support and are not benefits related to the tax savings produced by the State Coal royalty deduction.

An additional consideration in weighing the equities is whether innocent spouse treatment might result in the putative innocent spouse being relieved of liability for tax on that spouse's own income.  This might occur if the putative innocent spouse had income that was offset by a grossly erroneous deduction item of the putative guilty spouse.  See discussion in Elting, "Innocent Spouse Relief Availability Is Far From Certain", 23 Taxn. for Lawyers 205, 210-211 (1995).  In the

instant case, Nancy had practically no income for 1981, and so innocent spouse treatment would not relieve her from a liability she would have had even if she had filed a separate tax return. Thus, this consideration should not disqualify Nancy from innocent spouse status.

If our analysis were to end at this point, then we would conclude that it is inequitable to hold Nancy liable for the 1981 deficiency in tax.

However, Nancy directly received a $54,372.61 benefit from the tax savings produced by the State Coal royalty deduction. The tax refund check for 1980, received by Nancy in 1988 in the amount of $128,715.36, included $54,372.61 of Sheldon's withheld income tax for 1981 (plus the interest thereon), which amount would not have been available for transfer to the 1980 tax year if the State Coal royalty deduction had not created the $185,361 tax saving for 1981. We consider this to be a significant benefit. Thus, Nancy received a significant benefit on account of the grossly erroneous item.

In light of the foregoing, we conclude, and we have found, that it is not inequitable to hold Nancy liable for the deficiency.

Petitioners contend that the 1988 refund of 1980 taxes resulted from an abatement of 1980 tax liability and was not related to 1981. However, whatever may have been the source of

the abatement determination, there is no blinking the fact that the $54,372.61 plus interest that was a portion of the $128,715.36 refund was available to be paid to Nancy in 1988 solely because of the credit for 1981 that had been generated by the State Coal royalty deduction.

On answering brief, petitioners contend as follows:

Respondent's own witness testified that the amount "transferred back" to 1980 consisted of withholding credits and occurred April 15, 1982, a date which is prior to the filing of the Silverman's 1981 tax return, a date which is prior to the Internal Revenue Service receiving the tax return which contained the grossly erroneous item. Therefore, the prior "transfer back" of Sheldon Silverman's withholding credits had nothing whatsoever to do with the filing of the 1981 tax return and had nothing to do with the grossly erroneous State Coal Venture deduction claimed on the 1981 tax return. The "transfer back" of Sheldon Silverman's withholding credits was not contingent upon, nor did it result from the State Coal Venture deduction, as this "transfer back" occurred prior to the reporting of this grossly erroneous item. [Emphasis in original.]

The transcripts of account for Nancy's and Sheldon's 1981 and 1980 income tax liabilities show that the $54,372.61 transfer occurred, or was posted, as of April 15, 1982. It is clear, and we have found, that after the transfer the balance in Sheldon's and Nancy's 1980 account was zero. Examination of the adjustments shown on the transcript of account for 1980 and listed on supra table 6, shows that a $54,372.61 transfer into the 1980 account would make the balance zero only after giving effect to the September 27, 1982, adjustments. Thus, although the transfer was made as of April 15, 1982, it was made on or

about September 27, 1982. This is after the 1982 tax return filing date (Aug. 21, 1982), and matches the date of the refund of $81,054.77. See supra note 4 and associated text. We are satisfied, and we have found, that the $54,372.61 transfer was a transfer of part of the tax refund claimed on the 1981 tax return.

We hold for respondent on this issue.

As a result, we hold that Nancy fails to qualify for innocent spouse treatment under section 6013(e).

To reflect the foregoing and the parties' settlement of other issues,

Decision will be entered in accordance with the parties' stipulations, as described supra in note 2.