Madeline M. STEVENS,
Petitioner–Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 88–3422.

United States Court of Appeals,
Eleventh Circuit.

May 17, 1989.

Joe R. Wolfe, Clearwater, Fla., for petitioner-appellant.

William S. Rose, Jr., Asst. Atty. Gen., Gary R. Allen, Chief Robert S. Pomerance, Barbara I. Hodges, Tax Div., U.S. Dept. of Justice, Washington, D.C., for respondent-appellee.

Before JOHNSON and COX, Circuit Judges, and TUTTLE, Senior Circuit Judge.

COX, Circuit Judge:

Madeline M. Stevens appeals from a decision of the tax court denying her relief under the "innocent spouse" provision of the Internal Revenue Code (the "Code"), 26 U.S.C. § 6013(e) (1982 & Supp. III 1985). The court held her jointly liable with her ex-husband, Robert L. Stevens, for personal income tax deficiencies totaling $346,301.21 for the tax years 1976 through 1979. We affirm.

## I.

### A.

The protagonists in this case, Madeline and Robert Stevens, married in 1965 after Mrs. Stevens had attended two years of college and while Mr. Stevens was in the United States Navy. At the time of marriage, Mrs. Stevens had one child from a previous marriage, and, in 1969, she and Mr. Stevens had a second child. Upon his discharge from the Navy and for several years thereafter, Mr. Stevens worked in Pennsylvania as a computer specialist designing software and payroll systems. Subsequently, he sold insurance and, eventually, became a licensed securities dealer.

In May, 1974, Mr. Stevens formed his own securities firm, R.L. Stevens and Com-

pany, Inc. (RLSC), which specialized in the marketing and sales of life insurance annuities and tax shelters. Mr. Stevens served as president and treasurer of the corporation, and Mrs. Stevens served as secretary. Occasionally, Mrs. Stevens performed clerical services for the firm.

During the early days of RLSC, the Stevens' lives were fraught with financial worries. Ordinary household expenses became increasingly difficult to meet, and, by 1976, one of the Stevens' cars was repossessed for the Stevens' failure to make payments. By late 1976, however, the hard-luck spell had broken, and the Stevens' standard of living improved dramatically as Mr. Stevens began to earn substantial sums of money from his sales of, and investments in, tax shelters.

In early 1977, the Stevens moved to Sarasota, Florida, where Mr. Stevens located the RLSC headquarters and formed a second corporation, R.L. Stevens Investment Corporation (RLSIC), which specialized in selling and promoting tax shelters. Mr. Stevens was sole shareholder, president, and treasurer of the corporation, and Mrs. Stevens served as the corporate secretary. Occasionally, Mrs. Stevens performed part-time clerical services for the corporation.

When the Stevens moved to Florida, they purchased a waterfront home which had a swimming pool. The purchase was financed with a $50,000 down-payment and a $100,000 mortgage. In 1979, the Stevens moved to a larger, more expensive waterfront home in Siesta Key, Florida. This home had two docks, a jacuzzi, a swimming pool, and, on an adjacent lot, a paddle tennis court. The home was purchased for $200,000 and, subsequently, was sold for $600,000. While they owned this home, Mr. Stevens purchased a second home, at Riegels Landing, for $300,000; that home was used to entertain business guests and became the Stevens' primary residence sometime in 1983.

In 1978, Mr. Stevens relocated the headquarters of RLSC and RLSIC from an office building in Sarasota to a houseboat at the Sarasota City Marina. After the offices were moved, Mrs. Stevens worked for both corporations on a regular basis for several months. Her employment responsibilities included record-keeping in relation to the sale of tax shelters, compiling monthly reports to be sent to the Securities Exchange Commission, and typing business letters. For her services, Mrs. Stevens received nominal compensation.

In 1979, Mr. Stevens moved the RLSC and RLSIC offices from the houseboat to the home in Siesta Key. While the business was located in that home, syndicators of tax shelters frequently visited Mr. Stevens to discuss the pros and cons of the shelters they promoted. Occasionally, the discussions were held in the presence of Mrs. Stevens. Periodically, the Stevens entertained promoters of and investors in tax shelters at large, formal parties and seminars in their home. At those functions, business discussions regularly occurred in the presence of Mrs. Stevens.

As Mr. Stevens' business began to flourish, the Stevens' personal lifestyle became increasingly opulent. In addition to owning two luxurious homes at one time, the Stevens owned several boats (including three Excaliburs, which cost an average of $45,000 each) and numerous cars, including Cadillacs and twin XKE Jaguar convertibles. Mr. Stevens showered Mrs. Stevens with jewelry, including diamonds and gold ranging in price from a few thousand dollars up to $10,000 per item. During the years of abundance, all of the Stevens' business and personal bank accounts were in joint names or were accounts on which both Mr. and Mrs. Stevens had signatory authority. The Stevens' household expenses, which were as high as $6,000 per month, typically were paid with funds drawn from those accounts.

The Stevens' marriage declined during the prosperous years. By November 1983, the Stevens had legally separated; divorce followed shortly thereafter.

### B.

The Stevens filed joint federal income tax returns for the years 1976, 1977, 1978, and 1979. Those returns showed that the Ste-

vens owed a total of $2,240 in taxes for the years in question. The returns were prepared by accountants who met with the Stevens in the Stevens' homes to discuss them. Total yearly income, deductions, and net losses were reported on those returns in the following amounts:

| Year | Income | Deductions [1] | Net Loss |
|------|--------|------------|----------|
| 1976 | $101,253 | $(316,911) | $(215,658) |
| 1977 | 145,073 | (335,908) | (190,835) |
| 1978 | 276,567 | (427,009) | (150,442) |
| 1979 | 201,129 | (185,181) | ( 15,948) |

The deductions claimed by the Stevens in 1976 were attributable to asserted losses of $316,911 that flowed to them from three tax shelter partnerships in which Mr. Stevens personally had invested. The deduction claimed in 1977 was attributable to a carry forward of the unused portion of the 1976 loss and to a claimed loss of $120,250 from another of Mr. Stevens' tax shelter investments. The Stevens carried forward the unconsumed portion of those losses to 1978 and claimed an additional $236,000 loss from yet another of Mr. Stevens' investments. The unused portion of their claimed losses from those sources then was carried forward to 1979.

Following an audit of the returns for 1976 through 1979, the IRS issued a notice of deficiency to the Stevens asserting the following deficiencies in their joint income tax liability:

| Year | Deficiency |
|------|-----------|
| 1976 | $39,350.40 |
| 1977 | 65,950.87 |
| 1978 | 151,481.00 |
| 1979 | 89,519.00 |

The deficiencies were based on the IRS' disallowance of deductions claimed for losses relating to the tax shelters and disallowance of the resulting loss carry forwards. The notice of deficiency stated that the Stevens had failed to establish that deductible losses had been sustained.

In October 1983, the Stevens filed a joint petition in the tax court for a redetermination of the deficiencies, alleging that the losses claimed on their returns for 1976 through 1979 were allowable. In a separate petition, filed in February 1984, the Stevens additionally asserted that they had incurred a loss of $711,837 for 1980 and were entitled to have that loss carried back to reduce or eliminate any deficiencies otherwise owed for the years 1977, 1978, and 1979.[2] The Stevens, in March 1984, entered into a stipulation conceding the deficiency for 1976. Following the Stevens' divorce, Mrs. Stevens filed a motion to vacate the stipulation, which motion was granted.

Subsequently, Mrs. Stevens filed an amended petition, challenging the deficiency determinations as to her on the basis that she was entitled to relief from joint liability for the tax under the "innocent spouse" provision of the Code, 26 U.S.C. § 6013(e) (1982 & Supp. III 1985). After Mrs. Stevens filed her amended petition, she and Mr. Stevens entered into a new stipulation conceding deficiencies for 1976 through 1979 and reserving the right to carry back to 1977, 1978 and 1979 the claimed net operating loss for 1980. At trial, the sole issue presented was whether Mrs. Stevens was entitled to relief from the joint tax liability as an "innocent spouse." As noted, the tax court rejected that defense and assessed joint liability against the Stevens.

## II.

Mrs. Stevens raises three issues on appeal, only two of which merit discussion.[3] First, she contends that the tax court failed

1. The deductions shown reflect only deductions attributable to losses incurred on Mr. Stevens' tax shelter investments; they do not reflect itemized deductions for 1976, 1977, and 1978 in the respective amounts of $7,669, $12,583, and $14,432.

2. The 1980 loss evidently arose from another of Mr. Stevens' tax shelter investments; its allowability is the subject of separate proceedings pending before the tax court.

3. The third issue raised challenges the tax court's failure to consider the petition regarding the 1980 carry-back loss claim in conjunction with the innocent spouse litigation. As noted, supra, the carry-back claim is the subject of separate tax court proceedings; the tax court was not obligated to consolidate the cases for trial.

as a matter of law to apply the correct legal standard in determining that she did not qualify for innocent spouse relief. Second, she asserts that even if the tax court did apply the correct legal standard, the court clearly erred in concluding that she had failed to satisfy the elements necessary for such relief. The issues are discussed *seriatim*.

### A.

The rate of tax applied against a given amount of income generally is lower when the income is reported on a joint return than when a husband and wife file separate returns. The price which the law exacts for this privilege is that taxpayers who file a joint return are jointly and severally liable for the amount of tax due, *see* 26 U.S.C. § 6013(d)(3) (1982), regardless of the source of income reported and notwithstanding the fact that one spouse may be less informed about the contents of the return. *See Sonnenborn v. Commissioner*, 57 T.C. 373, 381 (1971); 26 U.S.C. § 6013(d)(3) (1982).

This general rule of joint and several liability is somewhat mitigated by the innocent spouse provision of the Code, 26 U.S.C. § 6013(e) (1982 & Supp. III 1985). In its initial version, the statute relieved one claiming innocent spouse status from joint liability in the following circumstances:

(A) a joint return has been made ... for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return,

(B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and

(C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for

such taxable year attributable to such omission * * *.

26 U.S.C. § 6013(e) (1982). Unlike its successor, this version of the statute applied only to items of income which the culpable spouse failed to report on the tax return and did not extend to deductions or credits that were erroneously claimed by the culpable spouse.

In 1984, and in response to criticism that the innocent spouse provision, as originally enacted, was "not sufficiently broad to encompass many cases [in which] the innocent spouse deserves relief," H.R.Rep. No. 432, 98th Cong., 2d Sess., pt. 2, at 1502, *reprinted in* 1984 U.S. Code Cong. & Admin.News 697, 1143, the provision was amended to provide, in pertinent part, as follows:

(e) Spouse relieved of liability in certain cases—

(1) In general—Under regulations prescribed by the Secretary, if—

(A) a joint return has been made under this section for a taxable year,

(B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse,

(C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and

(D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement,

then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement.

(2) Grossly erroneous items—For purposes of this subsection, the term "grossly erroneous items" means, with respect to any spouse—

(A) any item of gross income attributable to such spouse which is omitted from gross income, and

(B) any claim of a *deduction,* credit, or basis by such spouse in an amount for which there is *no basis in fact or law.*

26 U.S.C. § 6013(e) (1982 & Supp. III 1985) (emphasis added).[4]

 Under the current version, a spouse may obtain relief from liability where, on a joint return, (1) there is a substantial understatement of tax[5] attributable to grossly erroneous items of the other spouse; (2) in signing the return, the spouse did not know, and had no reason to know, that there was such substantial understatement of tax liability on the return; and (3) taking into account all of the facts and circumstances, it would be inequitable to hold the spouse liable for the deficiency attributable to such understatement. The taxpayer bears the burden of proving each of these elements by a preponderance of the evidence. *See Purcell v. Commissioner,* 826 F.2d 470, 473 (6th Cir.1987); *Farmer v. United States,* 794 F.2d 1163, 1164 (6th Cir.1986); *Shea v. Commissioner,* 780 F.2d 561, 565 (6th Cir.1986). *See also Sanders v. United States,* 509 F.2d 162 (5th Cir.1975). A failure to prove any one of them will prevent the taxpayer from qualifying for relief. *See Purcell,* 826 F.2d at 473; *Shea,* 780 F.2d at 565.

In the present case, the parties stipulated the deficiency determinations for 1976 through 1979, and further stipulated that the "substantial understatements of tax reflected on [the] joint returns for the years 1976 through 1979 are attributable to grossly erroneous items (namely, to deductions for which there was no factual or

legal basis) of Mr. Stevens." Contested, however, were Mrs. Stevens' knowledge of the understatements and whether it would be inequitable to hold Mrs. Stevens liable for the resulting deficiencies. Without considering the latter issue, the tax court concluded that Mrs. Stevens did not qualify as an innocent spouse because, at the time she signed the returns in question, she had reason to know that there were substantial understatements of tax liability on them that were attributable to grossly erroneous items claimed by Mr. Stevens.

 On appeal, Mrs. Stevens argues that the tax court applied the wrong "standard" when evaluating the knowledge element of the innocent spouse test. She contends that the correct inquiry under section 6013(e)(1)(C) is not whether she knew or had reason to know that the tax returns contained substantial understatements of tax liability attributable to grossly erroneous items; instead, she contends that the correct inquiry is whether, in signing the returns, she knew or had reason to know that the deductions claimed had "no basis in law or fact."[6]

 Mrs. Stevens makes a purely semantic argument without showing that there is a reasoned, meaningful distinction between her proposed knowledge "standard" and that which was applied by the tax court. Whether we begin our analysis of the alleged innocent spouse's knowledge by asking if the spouse, in signing the returns, knew or had reason to know that there were substantial understatements of tax liability attributable to grossly erroneous items claimed by the culpable spouse and then define grossly erroneous items as deductions for which there is no factual or legal basis, or whether we begin by asking

4. The amendments, which were part of the Deficit Reduction Act of 1984, Pub.L. No. 98–369, 98 Stat. 494 (the Act), were made retroactively effective to all open tax years to which the Code of 1954 applies. H.R.Rep. No. 432, 98th Cong., 2d Sess., pt. 2, at 1502, *reprinted in* 1984 U.S. Code Cong. & Admin.News 697, 1144.

5. Section 6013(e)(3), 26 U.S.C., defines substantial understatement as a liability exceeding $500. Section 6013(e)(4) further provides that in cases involving liabilities not attributable to

omissions of items from gross income, the understatement of tax also must exceed a specified percentage of the spouse's adjusted gross income for the preadjustment year. 26 U.S.C. § 6013(e)(4) (Supp. III 1985).

6. Generally, a deduction has no basis in law or fact if it is "fraudulent," "frivolous," "phony," or "groundless." *See Purcell v. Commissioner,* 826 F.2d 470, 475 (6th Cir.1987), and cases cited therein.

if the alleged innocent spouse, in signing the returns, knew or had reason to know that the deductions claimed had no factual or legal basis makes no difference. Each inquiry seeks to achieve the same end: to determine whether the alleged innocent spouse, in signing the returns, knew or had reason to know that the returns contained phony deductions. The tax court essentially conducted such an inquiry and, thus, committed no error.

### B.

Having determined that the tax court applied the correct standard in assessing Mrs. Stevens' knowledge of the substantial understatements of tax liability, we next must consider whether the court clearly erred in concluding that Mrs. Stevens failed to satisfy the knowledge element of the innocent spouse test. *See Sanders,* 509 F.2d at 166 n. 4. As noted, Mrs. Stevens had the burden of affirmatively proving that she did not actually know or have reason to know of the substantial understatements attributable to phony deductions. Because the tax court did not discuss whether Mrs. Stevens had actual knowledge of the understatements, we limit our discussion to whether she had "reason to know" of them.

▮▮▮▮ Adopting the common law "reason to know" standard,[7] the court in *Sanders v. United States,* 509 F.2d 162, 167 (5th Cir.1975), held that a spouse has "reason to know" if a reasonably prudent taxpayer under the circumstances of the spouse at the time of signing the return could be expected to know that the tax liability stated was erroneous or that further investigation was warranted.[8] The test establishes a "duty of inquiry" on the part of the alleged innocent spouse. Hence, the court's analysis must focus on whether the spouse had sufficient knowledge of the facts underlying the claimed deductions such that a reasonably prudent person in the taxpayer's position would question seriously whether the deductions were phony. Generally relevant to the "reason to know" determination are the alleged innocent spouse's level of education, *Probinsky v. Commissioner,* 55 T.C.M. (CCH) 1546 (1988); *Raskin v. Commissioner,* 41 T.C.M. (CCH) 1195 (1981), and involvement in the family's business and financial affairs, *Probinsky,* 55 T.C.M. (CCH) 1546; *Guth v. Commissioner,* T.C.Memo. 1987–522, *appeal filed* (9th Cir., Jan. 11, 1988); *cf. Coleman v. Commissioner,* 56 T.C.M. (CCH) 710 (1988); the presence of expenditures that appear lavish or unusual when compared to the family's past levels of income, standard of living, and spending patterns, *Sanders,* 509 F.2d at 167; *Coleman,* 56 T.C.M. (CCH) 710; *Mysse v. Commissioner,* 57 T.C. 680, 698 (1972); and, the culpable spouse's evasiveness and deceit concerning the couple's finances, *Sanders,* 509 F.2d at 167; *Coleman,* 56 T.C.M. (CCH) 710; *Probinsky,* T.C.M. (CCH) 1546; *Guth,* T.C.Memo. 1987–522. The alleged innocent spouse's role as homemaker and complete deference to the husband's judg-

---

**7.** *See* Restatement (Second) of Agency § 9, comment 9 (1958).

**8.** In adopting this standard, the *Sanders* court stated:

> We do not interpret this test as excluding consideration of the taxpayer's subjective condition when assessing the reasonableness of her actions. But neither does it preclude the setting of judicially-defined minima of reasonable prudence for individual taxpayers or classes of taxpayers. Hence, in some circumstances it might be possible for a court to conclude as a matter of law that a given taxpayer had reason to know of omissions from income....

*Sanders,* 509 F.2d at 166 n. 5. The court's language suggests that the "reason to know" standard has both subjective and objective com-

ponents. Although *Sanders* examined the "reason to know" test in the context of omissions from income, the test also applies to cases involving phony deductions.

We reject Mrs. Stevens' assertion that she did not have "reason to know" that the deductions were phony because of her insufficient legal acumen. As a practical matter, this argument is tantamount to a claim that ignorance of the law is an element of the innocent spouse defense, and, as such, is incorrect. *See Sanders v. United States,* 509 F.2d 162, 169 n. 14 (5th Cir.1975). A taxpayer is presumed to have knowledge of the tax consequences of a transaction, but is not presumed to have knowledge of the transaction itself. *See Quinn v. Commissioner,* 524 F.2d 617, 626 (7th Cir.1975).

ment concerning the couple's finances, however, standing alone are insufficient to establish that a spouse had no "reason to know." *See Shea*, 780 F.2d at 556.

■ At least one commentator has suggested that the presence of relatively unusual or lavish expenditures should not be considered as significant where the substantial understatements of tax liability are attributable to erroneously claimed deductions, as opposed to omissions from income, since it is difficult, if not impossible, to correlate a higher standard of living with the erroneous deductions. *See,* Borison, *supra* note 7, at 836. Although we agree that large deductions are not necessarily inconsistent with a lavish lifestyle, we refuse to characterize that factor as unimportant. Where, in a case such as this, staggering deductions—deductions which equal or exceed one's income—are claimed, the appearance of those deductions on a tax return, combined with an affluent lifestyle that has been wholly unaffected by the losses allegedly incurred, makes the presence of unusual and lavish expenditures highly pertinent. Moreover, where erroneous deductions are claimed, the alleged innocent spouse's participation in the family's financial affairs becomes particularly significant.

In the present case, Mrs. Stevens contends that the tax court clearly erred in concluding that she had failed to prove that she had no reason to know of the substantial understatements of tax liability attributable to the phony deductions. In support of her contention, Mrs. Stevens makes the following assertions: First, she contends that from 1976 through 1979, she was a housewife solely concerned with raising her children and that her role did not include managing the family's finances. She further maintains that she did not know that Mr. Stevens was investing their personal assets in tax shelters during the period in question and that she never discussed investments with Mr. Stevens because she was not permitted to do so. Finally, she argues that she did not want the expensive cars, boats, and jewelry that were purchased for her.

The government, in contrast, essentially contends that there is sufficient evidence in the record to discredit and rebut Mrs. Stevens' contention that she had no reason to know of the substantial understatements of tax liability. In support of its position, the government points out that Mrs. Stevens participated in Mr. Stevens' business not only as an officer in both of his corporations, but also as a secretary and bookkeeper, and, therefore, had unhindered access to the facts underlying the tax shelters in which Mr. Stevens invested and which gave rise to the tax deficiencies. The government further emphasizes that Mrs. Stevens was present on numerous occasions when Mr. Stevens discussed tax shelters with his business clients and colleagues; Mr. Stevens periodically discussed the pros and cons of various shelters with Mrs. Stevens, so that she knew generally the nature of the shelters he sold and in which he invested; and, both Mr. and Mrs. Stevens discussed their tax returns with the accountants who prepared them and, consequently, Mrs. Stevens knew that the losses claimed on the returns were attributable to tax shelter investments made by Mr. Stevens. Finally, the government stresses that the Stevens enjoyed a very high standard of living characterized by numerous unusual and lavish expenditures.

In denying Mrs. Stevens innocent spouse relief, the tax court concluded that Mrs. Stevens' participation in Mr. Stevens' business affairs, when combined with the Stevens' lavish lifestyle, should have given Mrs. Stevens reason to know that the joint income tax returns in question contained substantial understatements of tax liability attributable to phony deductions. After examining the record of circumstantial evidence in this case, we conclude that the tax court did not clearly err in concluding that Mrs. Stevens failed to prove that she had no reason to know of the substantial understatements of tax liability. Indeed, the record is replete with evidence that Mrs. Stevens, in signing the returns, was aware of facts which would incline a reasonable person in her position to question seriously

the tax liability reported on the returns.[9]

Mrs. Stevens' assertions that she was a housewife concerned only with raising her children and was not responsible for managing the family's finances are improper bases for contending that she did not have reason to know of the understatements of tax liability. As noted, a spouse cannot be excused from the imputation of constructive knowledge simply because she was a homemaker and relied on her husband to handle the family's finances. Moreover, the evidence she proffered in support of her contention that she was unaware of the nature and fact of Mr. Stevens' business and personal investments is insufficient to establish that she had no reason to know of the understatements. Indeed, the record is replete with evidence to the contrary: Mrs. Stevens' own testimony before the tax court reveals that she was present on numerous occasions when conversations were held between Mr. Stevens and his business acquaintances concerning Mr. Stevens' business investments. Furthermore, Mrs. Stevens testified that she divined additional information regarding those investments through her work with RLSC and RLSIC. Finally, Mr. Stevens testified that he discussed his personal investments with Mrs. Stevens for the purpose of informing her that such investments had been made.

Additionally, Mrs. Stevens' assertion that she was "not permitted" to discuss investments with Mr. Stevens and complaint that Mr. Stevens made a concerted effort to keep her ignorant about the family's finances do not support her position that she had no reason to know about the understatements of tax liability. In fact, far from exonerating Mrs. Stevens from liability, Mr. Stevens' evasiveness should have prompted Mrs. Stevens to question Mr. Stevens' activities and the validity of the items reported on the tax returns. Mrs. Stevens testified that Mr. Stevens denied her the opportunity to review their tax returns, and, instead, presented the returns to her the night before they were due and insisted that she sign them. Significantly, Mrs. Stevens implied that she questioned the fact that the returns for 1976, 1977, and 1978 showed that no income taxes were due and admitted asking both for an explanation and for copies of all of the returns. Ultimately, she confessed, she "blindly" signed the returns. A spouse cannot harbor doubts about the accuracy of a return and then turn a blind eye toward it. *See Sanders*, 509 F.2d at 169. In signing a return, a taxpayer represents that the matters stated therein are true and correct to the best of his or her knowledge. That responsibility cannot be abdicated or evaded merely by ignoring returns that are suspect and which would prompt a reasonable person in the same position to investigate before signing them.

Finally, Mrs. Stevens' statement that she "did not want" the expensive cars, boats, and jewelry that were purchased for her in no way is probative of her assertion that she had no reason to know of the understatements of tax liability. If anything, her statement is a tacit admission that the Stevens' expenditures during the years in question were unusual or lavish in comparison to those of previous years. The record indicates that she, in fact, did question the expenditures that both she and Mr. Stevens made. Specifically, when questioned about their purchase of the Jaguar convertibles, Mrs. Stevens indicated her bewilderment over the sudden, dramatic increase in the family's resources between 1976 and 1977, and admitted harboring some doubts about their subsequent, relatively profuse spending habits. Given the Stevens' affluence and income tax returns reflecting losses greatly in excess of income, it is hard to conceive that one in Mrs. Stevens' position would not have been inclined to question seriously the accuracy of the tax liability stated on the returns.

Having concluded that Mrs. Stevens failed to prove that she did not have reason to know of the substantial understatements

---

9. In reaching this conclusion, we note that when the parties in a case such as this stipulate that claimed deductions have no basis in law or fact but fail to mention in the stipulation precisely why the deductions were disallowed, it becomes more difficult for an appellate court to review the reason to know issue.

of tax liability attributable to phony deductions and, therefore, did not qualify as an innocent spouse, the tax court correctly declined to consider whether Mrs. Stevens had satisfied the other elements necessary for innocent spouse relief. *See Shea,* 780 F.2d at 567.

### III.

For the foregoing reasons, the tax court's decision is

AFFIRMED.