T.C. Memo. 1997-478


UNITED STATES TAX COURT


SHERRY P. AUDE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 45011-85, 18375-86.     Filed October 21, 1997.


<u>Gordon B. Cutler</u>, for petitioner.

<u>Glorianne Gooding-Jones</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WRIGHT, <u>Judge</u>:  Respondent determined the following deficiencies in and additions to petitioner's Federal income taxes:

Additions to Tax

| Year | Deficiency | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6659 | Sec. 6661 |
|------|-----------|-----------------|-----------------|-----------|-----------|
| 1980 | $28,885 | $1,444.25 | --- | --- | --- |
| 1981 | 37,414 | 1,870.70 | [1] | $11,224.20 | |
| 1982 | 57,560 | 2,878.00 | [2] | | $5,756.00 |

[1] 50% of the interest due on $37,414
[2] 50% of the interest due on $57,560

After concessions,[1] the issue for decision is whether petitioner qualifies for innocent spouse relief under section[2] 6013(e), for taxable years 1980, 1981, and 1982. We hold that she qualifies for innocent spouse relief.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein. Petitioner resided in Northridge, California, when the petition was filed.

Background

During the years at issue, petitioner was married to Peter F. Aude (Mr. Aude). Petitioner and Mr. Aude were divorced in

---

[1] In April of 1988, petitioner and respondent entered into two Stipulations of Agreed Issues providing that if petitioner did not prevail in her innocent spouse claim, she would be entitled to take advantage of the settlement offer extended to petitioner's former husband (Mr. Aude).

Petitioner has conceded that she is not allowed the claimed interest expense deductions of $1,725 in 1981 and $2,875 in 1982. Therefore, petitioner is liable for the portion of the 1981 and 1982 income tax understatements relating thereto.

[2] All section references are to the Internal Revenue Code in effect for the years in issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure.

September of 1983. The Audes filed joint Federal income tax returns for each taxable year at issue.

Petitioner was born on August 10, 1951. In 1969, she graduated from high school with approximately a 2.0 grade point average. After graduating from high school, petitioner worked primarily as a receptionist in the Los Angeles area.

In August of 1969, petitioner married for the first time. She had a son, Michael, in January of 1972. Petitioner divorced in 1973; however, in August of 1974, petitioner and her first husband had a second child, who was later given up for adoption.

In 1975, petitioner worked as a receptionist for the Landsberg Company (Landsberg). There, she met Mr. Aude, who worked as a salesperson for Landsberg. At the time, Mr. Aude was divorced with two children from a prior marriage. In February 1976, petitioner and Mr. Aude, who was then 33 years old, were married. Petitioner and Mr. Aude had two sons: Peter, born in December 1978, and Erik, born in April 1980.

During her marriage to Mr. Aude, petitioner worked as a housewife and mother.[3] She had the role of taking care of five children: Michael, Peter, Erik, and Mr. Aude's two sons from his prior marriage (who lived part of the time with petitioner and Mr. Aude).

_____

[3] In 1980 and 1981, petitioner had a part-time job selling books for World Book--Childcraft International, Inc. However, petitioner only earned $37.68 in 1980 and $144.17 in 1981 from this part-time job.

During the years at issue, petitioner did not buy any jewelry or expensive clothes. She drove a 1980 station wagon. During this period, the Audes took one vacation to Hawaii in December of 1982. Until their divorce, petitioner and Mr. Aude lived in the same house, which they purchased in 1976. They had built an addition to that house in 1978-79.

Throughout their marriage, petitioner and Mr. Aude maintained a joint bank account. Initially, Mr. Aude handled all the finances. In 1978, Mr. Aude gave petitioner a monthly allowance of $3,000 to pay the household bills. This monthly allowance was used to pay Mr. Aude's alimony and child support to his ex-wife, household bills, food, and medical expenditures. While the allowances at times decreased during the years at issue, they never increased. Using her monthly allowance, petitioner wrote checks out of the joint bank account, and recorded the checks in her register; however, the Audes maintained separate check registers. Petitioner never saw the checks Mr. Aude wrote or his check register. Petitioner never examined the bank statements because it was Mr. Aude's job to review the bank statements.

Petitioner was uninvolved in the business affairs of Mr. Aude. Occasionally, petitioner would accompany Mr. Aude to business meetings, but after introductions she would stay in the lobby or in the car during the actual meeting. She was unaware of Mr. Aude's salary and his investment income. If petitioner

questioned Mr. Aude about the financial affairs, Mr. Aude would respond that it was his money, and therefore it was not her concern.

Magnum Oil and Gas

In late 1979 or early 1980, Mr. Aude met with Mr. Saranni, a sales representative, to discuss a potential investment in Magnum Oil and Gas (Magnum), a limited partnership. Magnum was organized to acquire and develop oil and gas properties. While the record is unclear regarding this meeting, infra, we determine at a minimum that this meeting was attended by Mr. Aude, Mr. Saranni, petitioner, and Mr. Gruys, the Audes' certified public accountant and attorney. After the meeting, Mr. Gruys discussed the investment with Mr. Aude and petitioner. In this discussion, Mr. Gruys did not tell the Audes that it was a sham investment, nor did he advise the Audes of the audit risk. He recommended that the Audes not purchase an interest in Magnum because it was "an inappropriate investment."[4]

In July 1980, Mr. Aude purchased 2.3 units in Magnum for $86,250.[5] Only Mr. Aude executed the investment papers and he alone made the required capital contribution payments. At a later date, petitioner discovered that Mr. Aude invested in

---

[4] To Mr. Gruys, an inappropriate investment meant that they might lose their capital investment.

[5] Mr. Aude paid the purchase price through installments: $23,000 in July 1980; $23,000 in March 1981; $23,000 in March 1982; and $17,250 in March 1983.

Magnum, but Mr. Aude did not disclose the tax shelter nature of the investment to petitioner. She never saw the investment papers concerning Magnum, and she was unaware of Mr. Aude's capital contribution in Magnum.

1980, 1981, 1982 Joint Income Tax Returns

For the years at issue, Mr. Gruys prepared the Audes' Federal income tax returns. He only occasionally talked with petitioner, generally around the tax preparation time. Instead, he generally saw Mr. Aude. Petitioner's main involvement in completing the returns was to compile a list of household expenditures for Mr. Gruys. She would accompany her husband to deliver the list to Mr. Gruys. After preparation, Mr. Aude would present the returns, folded to the signature page, for petitioner's signature. At these times, both Mr. Aude and Mr. Gruys had already signed the return. Prior to signing the returns, petitioner did not review them.

In regard to the Magnum investment, Mr. Gruys never reviewed any papers regarding the investment. In preparation of the tax returns for the years at issue, Mr. Gruys relied on the Schedules K-1 prepared by Magnum. In advising the Audes, Mr. Gruys did speak with Mr. Aude in passing regarding the validity of the deductions for the investment, but he did not talk with petitioner about the deduction.

The joint returns for 1980, 1981, and 1982, as originally filed, reflect income, Magnum deductions, adjusted gross income,

itemized deductions, and taxable income as follows:

| Year | Income from Wages, Interest | Magnum Deduction | Adjusted Gross Income | Itemized Deductions | Taxable Income |
|------|------|------|------|------|------|
| 1980 | $137,219 | $ 99,015 | $38,204 | $44,311 | (6,107) |
| 1981 | 145,168 | 105,103 | 40,065 | 44,962 | (11,897) |
| 1982 | 124,958 | 114,731 | 10,227 | 39,553 | (36,326) |

Respondent disallowed in part the Magnum loss deductions,[6] medical and dental expenses, and interest expense deductions. The understatement for the years at issue was primarily created by the disallowance of the Magnum loss deduction.

The Audes' Marriage and Divorce

Petitioner and Mr. Aude had a rocky marriage, filled with arguments, separations, reconciliations, and professional therapy. Prior to and during the years at issue, Mr. Aude physically abused petitioner. The abuse resulted in petitioner's sustaining cracked ribs, bruised lungs, and concussions, which at times required medical treatment and hospitalization. As a result of the abuse, petitioner called the police several times, and also obtained a restraining order against Mr. Aude. A pattern of violence developed in their marriage, especially when petitioner questioned Mr. Aude's decisions or behavior. As a result of this pattern of abuse, petitioner avoided questioning Mr. Aude on any issue.

---

[6] Respondent disallowed the following Magnum deductions: $90,626 in 1980; $105,103 in 1981; and $114,731 in 1982.

In December 1979, petitioner, prompted by Mr. Aude's physical abuse, filed for a divorce. The action was later dismissed in early 1983. During this period, petitioner and Mr. Aude were sometimes separated, and they attended counseling for a period of time.

In March 1983, petitioner filed a second divorce action. As with the first divorce action, this action was based on Mr. Aude's physical abuse. The divorce was granted in September of 1983. Pursuant to the divorce proceedings, petitioner received the following distribution of community assets: personal effects, the family home, household furniture, a 1980 station wagon, and an interest in Mr. Aude's profit sharing fund. Tax refunds were not apportioned to petitioner. In the divorce settlement, Mr. Aude received the Magnum investment.

Mr. Aude was ordered to pay alimony to petitioner for 6 years. The amount of alimony ranged from $3,000 per month in 1983 to $2,000 per month in 1986. Following the divorce, petitioner was granted custody of Peter and Erik. Due to an accident in 1989, Erik sustained severe injuries, which require substantial medical care and attention. This has prevented petitioner from working. Currently, petitioner has full custody of Erik, while Mr. Aude has full custody of Peter. Mr. Aude was also ordered to pay child support, which ranged from $1,000 per month in 1983 to $1,500 per month in 1986 to $2,650 per month in 1989 to $1,600 per month currently. At times, Mr. Aude was in

arrears in the alimony and child support payments.

Events Subsequent to the Audes' Divorce

After the marriage ended, petitioner learned information regarding the financial affairs for the years at issue.  She discovered that Mr. Aude had written checks to supermarkets, which were hundreds of dollars over the actual purchase price.  She also learned the financial worth of the household during the years at issue.

In 1988, petitioner sold the family home, which she received in the divorce, and used the proceeds to purchase a home in Palmdale, California (Palmdale home).  The Palmdale house was later refinanced to pay Erik's medical bills.  Currently, the Palmdale home is held as a rental property, but the rental income derived from the property does not cover the mortgage on the property.  After withdrawing funds for attorney fees for the divorce and for medical expenses for Erik, petitioner rolled over the balance of the profit-sharing fund into an individual retirement account.

After her divorce from Mr. Aude, petitioner worked part-time for a university.  She attended college on a part-time basis from 1983 through 1985, but she had to quit when Mr. Aude became delinquent in his alimony payments.  In 1990, petitioner enrolled in a junior college to study computers.  Petitioner remarried in 1990.  At the time of trial, petitioner and her current husband were unemployed.

Currently, Mr. Aude is financially stable. Through a bankruptcy proceeding, he has been discharged of his obligation on his tax liability.

OPINION

As a general rule, a husband and wife who file joint tax returns are jointly and severally liable for Federal income tax due on their combined incomes. Sec. 6013(d)(3); Guth v. Commissioner, 897 F.2d 441, 442 (9th Cir. 1990), affg. T.C. Memo. 1987-522; Price v. Commissioner, 887 F.2d 959, 961 n.3 (9th Cir. 1989), revg. an Oral Opinion of this Court. However, section 6013(e)(3) mitigates this general rule to some extent. Guth v. Commissioner, supra at 442-443; Price v. Commissioner, supra at 961.

For petitioner to qualify as an innocent spouse, she must establish: (1) That a joint return was filed for each year in issue; (2) that there were substantial understatements of tax attributable to grossly erroneous items of the other spouse on the return; (3) that, in signing the returns, she did not know or have reason to know of the substantial understatements; and (4) that taking into account all the facts and circumstances, it would be inequitable to hold her liable for the deficiencies and additions to tax. Sec. 6013(e)(1)(A) through (D)[7]; Guth v.

---

[7] The current "innocent spouse" provisions were enacted as part of the Deficit Reduction Act of 1984 (the Act), Pub. L. 98-369, 98 Stat. 494, 801. Sec. 424(c) of the Act rendered the amendments to sec. 6013(e) applicable to all taxable years to

Commissioner, supra at 443; Price v. Commissioner, supra at 961-962.  Petitioner has the burden of proving each element of section 6013(e) by a preponderance of the evidence.  Rule 142(a); Price v. Commissioner, supra at 962; Bokum v. Commissioner, 94 T.C. 126, 138 (1990), affd. 992 F.2d 1132 (11th Cir. 1993). Since the elements are conjunctive, the failure to prove any one of the elements will preclude petitioner from relief.  Stevens v. Commissioner, 872 F.2d 1499, 1504 (11th Cir. 1989), affg. T.C. Memo. 1988-63.

Respondent and petitioner stipulated that joint returns were filed for the years in issue and that the returns contain substantial understatements of tax attributable to grossly erroneous items of Mr. Aude.  Therefore, the controversy, arising from the erroneous deduction of the Magnum loss, focuses on the third and fourth requirements:  (1) Whether the petitioner, in signing the return, knew or had reason to know of the substantial understatement and (2) whether it would be inequitable to hold petitioner liable for the deficiency.

Section 6013(e)(1)(C) Knowledge or Reason To Know

Section 6013(e)(1)(C) requires that the petitioner establish "that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement".

---

which the Internal Revenue Code of 1954 applies.  Therefore, sec. 6013(e), as so amended, governs the tax years at issue in the instant proceeding.

The Court of Appeals for the Ninth Circuit's test for knowledge in erroneous deduction cases is applicable to this case. Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). Under this test, mere knowledge of the transaction will not cause denial of relief; rather, the test is whether petitioner had knowledge that the deduction would give rise to a substantial understatement. Price v. Commissioner, supra at 963.

Respondent contends that the evidence clearly shows that petitioner had actual knowledge of the underlying facts of the investment. Respondent primarily relies on petitioner's participation in the late 1979 or early 1980 meeting where the Magnum investment was discussed.

While the meeting regarding the Magnum investment occurred, the record provides conflicting evidence concerning who attended this meeting. Mr. Gruys clearly stated that he and petitioner attended the meeting along with Mr. Aude and Mr. Saranni. However, petitioner's recollection is that Mr. Gruys did not attend the meeting; that she met with Mr. Saranni briefly; and that she sat in the lobby of the hotel while the meeting between Mr. Saranni and Mr. Aude occurred in another room. In light of petitioner's burden, we cannot find that petitioner did not attend the meeting.

While petitioner had knowledge of the underlying transaction by attending the meeting, knowledge of the transaction alone will not cause denial of relief to petitioner, unless petitioner knew

that the deductions attributable to Mr. Aude's investment in the transaction would give rise to a substantial understatement. Id. In regard to the meeting, Mr. Gruys could not recall the specifics of the tax discussion, such as whether tax writeoff ratios were discussed or not. At this time, while explaining the investment, Mr. Saranni did not say that the investment was a sham, and Mr. Saranni did not say that the claimed losses would be disallowed if the returns were audited. Furthermore, Mr. Gruys did not tell the Audes that it was a sham investment, nor did he advise the Audes of the audit risk. He merely recommended that the Audes not purchase an interest in Magnum because it was "an inappropriate investment."

An examination of the record reveals that Mr. Aude alone executed the investment papers, and he made the required capital contribution payments. Petitioner never saw the investment papers, and was unaware of the amount of money that Mr. Aude invested in Magnum. Further, Mr. Aude did not tell her that the investment would save taxes or that it was a tax shelter.

Further, petitioner's lack of knowledge regarding the transaction is corroborated by Mr. Gruys' responses. Mr. Gruys only occasionally talked with petitioner; instead, he generally saw only Mr. Aude. Never reviewing any papers regarding the investment, Mr. Gruys relied on the Schedules K-1 prepared by Magnum in his preparation of the Audes' returns. In advising the Audes, Mr. Gruys did not speak to petitioner regarding the

validity of the deductions for the investment, but Mr. Gruys did talk to Mr. Aude, in passing, about this.

Considering the evidence and finding petitioner to be a credible witness, we find that petitioner was uninformed about the nature of the Magnum investment.[8]  We find that petitioner did not have actual knowledge that the deductions attributable to the Magnum investment would result in the substantial understatements of tax on petitioner's income tax returns for the years at issue.

Section 6013(e)(1)(C) also requires that the petitioner establish that she did not have reason to know that there was such substantial understatement.  Whether an alleged innocent spouse had reason to know of a substantial understatement is a question of fact that must be determined based upon the entire record.  Guth v. Commissioner, 897 F.2d at 442; Terzian v.

---

[8]  Respondent contends that it is obvious that petitioner "had previously asked questions concerning the Magnum investment, that she knew a substantial number of facts pertaining to the investment, and that she possessed both the ability and the opportunity to have asked more questions of those knowledgeable about the shelter, namely the Magnum salesman as well as her own CPA, Mr. Gruys."  In making this assertion, respondent relies on petitioner's following response:  "It was after being educated by Mr. Cutler [petitioner's attorney], that we should have been advised that this was not a good investment, that I was angry that I had been such a fool, and not asked more questions."  While respondent asserts that petitioner obviously knew of the investment, we do not find that this statement shows that petitioner had the ability or opportunity to ask about the investment.  The response indicates that petitioner did not know the nature of the investment until years after the tax years at issue; thus, the statement by petitioner does not obviously lead to respondent's conclusion.

Commissioner, 72 T.C. 1164, 1170-1172 (1979).  A taxpayer has reason to know of a substantial understatement of tax if a reasonably prudent taxpayer under the circumstances of the spouse at the time of signing the return could be expected to know that the tax liability stated was erroneous or that further investigation was warranted.  Stevens v. Commissioner, supra at 1505.  We must place the reasonably prudent person in the particular circumstances of the taxpayer.  Pietromonaco v. Commissioner, 3 F.3d 1342, 1345 (9th Cir. 1993), revg. T.C. Memo. 1991-472.  "[T]he more a spouse knows about a transaction, ceteris paribus, the more likely it is that she will know or have reason to know that the deduction arising from that transaction may not be valid."  Price v. Commissioner, 887 F.2d at 963, n.9.

When deciding whether an alleged innocent spouse had reason to know of a substantial understatement in both omission and deduction cases, the following factors are considered: (a) The spouse's level of education; (b) the spouse's involvement in the family's business and financial affairs; (c) the presence of expenditures that appear lavish or unusual when compared to the family's past levels of income, standard of living, and spending patterns; and (d) the culpable spouse's evasiveness and deceit concerning the couple's finances.  Price v. Commissioner, supra at 965; see also Stevens v. Commissioner, 872 F.2d 1499, 1505 (11th Cir. 1989).  In making our determination, we must consider the interplay or balance of the factors, instead of merely

counting the factors in a spouse's favor.  Guth v. Commissioner, supra at 444.

We first consider petitioner's level of education.  At the time petitioner signed the returns, her highest level of education was a high school diploma, which she earned with a 2.0 grade point average.  She did not have any education or work experience in tax, financial or accounting matters.  Respondent contends that petitioner "possesses considerable common sense and life experience", but we find nothing in the record regarding her education and experiences that would or should have alerted her to the pitfalls of this situation.

We next consider petitioner's involvement in her family's financial and business affairs.  Mr. Aude dominated the financial side of the marriage with petitioner playing a minor role in the family's finances.  While petitioner was introduced to Mr. Aude's business contacts, she did not attend the meetings (except for the initial Magnum meeting).  She was not informed of the specifics of Mr. Aude's investments.  If petitioner questioned Mr. Aude about the financial affairs, Mr. Aude would respond that it was his money, and therefore it was not her concern.

Petitioner's only job with regard to the family's finances was to pay the household bills from the monthly allowance.  She wrote checks out of a joint account and recorded the checks in her own check register.  However, petitioner never saw the checks Mr. Aude wrote or his check register.  Additionally, petitioner

never examined the bank statements because it was Mr. Aude's job to review the bank statements.

Petitioner played a minimal role in the tax preparation of her and Mr. Aude's returns. While petitioner prepared a summary of the household expenditures for Mr. Gruys, she was generally not present when Mr. Aude furnished his information to Mr. Gruys. Mr. Gruys primarily talked with Mr. Aude, and only occasionally talked with petitioner, usually when petitioner submitted her list of expenditures.

The third factor we consider is the presence of lavish or unusual expenditures by the family. Examining the record, there were no major differences in the Audes' standard of living before, during, or after the period in which these deductions were claimed. First, petitioner received a monthly allowance, which was used to care for five children and the other household expenses. While the allowances at times decreased during the years at issue, they never increased. Petitioner did not buy any jewelry or expensive clothes during this period, and she drove a 1980 station wagon. During the 3 years at issue, the Audes only took one vacation in December of 1982. Further, during the years at issue, petitioner and Mr. Aude lived in the same house, which they purchased in 1978. They had built an addition to that house in 1978-79. Taken together, these expenditures do not amount to unusual, lavish, or extravagant expenditures.

The fourth factor is whether Mr. Aude was evasive or

deceitful about the couple's finances.  Under case law, this factor is to be viewed in a broader context by looking at the totality of the circumstances.  As such, this factor can include a taxpayer's refusal to be forthright about the couple's income or a taxpayer's refusal to discuss investments.  <u>Sanders v. United States</u>, 509 F.2d 162, 167 (5th Cir. 1975).

Besides the monthly allowance, Mr. Aude dominated all aspects of the financial situation.  There is no evidence that Mr. Aude was deceitful regarding the finances.  However, if petitioner asked Mr. Aude any question regarding their finances, Mr. Aude would say it was his money and thus not her concern.  It was only after the marriage ended that petitioner learned more details regarding the financial affairs for the years at issue, including the financial worth of the household.  By keeping petitioner uninformed about "his money," Mr. Aude was not open about the couple's finances.  His refusal to discuss the family finances and investment impeded petitioner's "reason to know" about the understatement.

Considering all of the circumstances concerning these returns, we conclude that a reasonably prudent person under petitioner's circumstances--living a modest life, uninvolved in the financial affairs of the family, and without any financial background -- at the time of signing could not be expected to know that Mr. Aude's deductions would give rise to an understatement of tax.

Respondent asserts that a cursory review of the return would have alerted petitioner to the erroneous loss deduction. Respondent alleges that a casual glance by petitioner would have revealed that the deductions substantially reduced gross income to arrive at adjusted gross income. In addition, respondent relies on the fact that petitioner knew the amount of her monthly household expenditures, so that petitioner should have been aware that "they were living tax free" in light of the differential between those expenditures and the negative taxable income reported on their returns for the years at issue. In light of these factors, respondent contends that petitioner had a reason to investigate.

Even if a spouse has no "reason to know" of the substantial understatement, the spouse may know facts that put her "on notice" of the understatement. Price v. Commissioner, 887 F.2d at 965; Stevens v. Commissioner, 872 F.2d at 1505. With a duty to inquire, the spouse seeking relief cannot turn a blind eye to facts within his or her reach that would have put a reasonably prudent taxpayer on notice to inquire further. McCoy v. Commissioner, 57 T.C. 732, 734 (1972). Petitioner would not qualify for section 6013(e) relief merely because she relied on others, such as her husband or a tax preparer, to complete the return properly. Hayman v. Commissioner, 992 F.2d 1256, 1262 (2d Cir. 1993), affg. T.C. Memo. 1992-228; Park v. Commissioner, T.C. Memo. 1993-252, affd. 25 F.3d 1289 (5th Cir. 1994).

In order for a spouse's duty of inquiry to arise, she must first harbor doubts about the accuracy of the return. Stevens v. Commissioner, supra at 1507. A spouse may be put on notice of the understatement if a reasonably prudent person "in her position would be led to question the legitimacy of the deduction." Price v. Commissioner, supra at 965. One relevant factor looks at the extent to which family expenditures, about which the spouse had knowledge, exceed reported income. Hammond v. Commissioner, T.C. Memo. 1990-22, affd. 938 F.2d 185 (8th Cir. 1991). Other factors include a spouse's specific and detailed knowledge of the transaction giving rise to the deduction and the spouse's involvement in the family's financial affairs. Shea v. Commissioner, 780 F.2d 561, 567 (6th Cir. 1986), affg. in part, revg. in part, and remanding in part T.C. Memo. 1984-310. Physical or mental abuse may be a factor in considering innocent spouse relief. Kistner v. Commissioner, 18 F.3d 1521, 1526 (11th Cir. 1994), revg. and remanding T.C. Memo. 1991-463; Makalintal v. Commissioner, T.C. Memo. 1996-9.

"Tax returns setting forth large deduction, such as tax shelter losses offsetting income from other sources and substantially reducing or eliminating the couple's tax liability, generally put a taxpayer on notice that there may be an understatement of tax liability." Hayman v. Commissioner, supra at 1262. The Audes claimed the following loss deductions arising from Magnum: $99,015 in 1980; $105,103 in 1981, and $114,731 in

1982. If petitioner had made a examination of the returns, she would have noticed the deductions, but we need to determine whether a reasonably prudent taxpayer in petitioner's position would have inquired further.

In the instant case, besides writing checks for the household expense, she was uninvolved in the family's finances. She was unaware of Mr. Aude's salary during the years at issue. When petitioner signed the returns, she was aware of the existence of the Magnum transaction, but she never saw the investment papers or knew the amount of Mr. Aude's capital contributions in Magnum. Further, she was unaware of its tax shelter nature. There were also no unexplained lavish or unusual expenditures around this time which should have aroused petitioner's curiosity. In sum, there were no facts present which would have caused petitioner to harbor doubts about the accuracy of the returns.

In signing the returns, petitioner neither reviewed the returns nor questioned Mr. Gruys or Mr. Aude regarding the returns. While petitioner's duty cannot be relieved based solely on petitioner's reliance on her preparer, it is a factor to be considered in light of the other circumstances. See Hayman v. Commissioner, supra at 1262. In the preparation of the tax returns, petitioner would submit her information regarding the household expenses to Mr. Gruys, but she was not present when Mr. Aude furnished his information to Mr. Gruys. Further, Mr. Gruys

rarely talked with petitioner. Instead he primarily discussed matters with Mr. Aude. Relying on Mr. Gruys as the professional preparer, petitioner signed the returns without questioning the return, in light of the fact that Mr. Gruys had already signed the return. Under the circumstances, petitioner was entitled to rely upon the legitimacy that Mr. Gruys lent to the joint returns.

Complete deference to the husband's judgment concerning the couple's business affairs alone is not enough to grant innocent spouse relief. Stevens v. Commissioner, supra at 1505-1506. "Nevertheless, where physical or mental abuse is shown, even when the abuse does not rise to the level of coercion, a basis may exist for allowing innocent spouse relief." Kistner v. Commissioner, supra at 1526 (treating the taxpayer's professed fear of physical violence as one of the factors to determine if she could be expected to know of the deduction or whether further inquiry was necessary).

Stipulating that joint returns were filed for the years at issue, petitioner raises the argument that Mr. Aude's physical abuse of petitioner is a factor to be considered when determining petitioner's duty to inquire. See Wiksell v. Commissioner, 90 F.3d 1459, 1462 (9th Cir. 1996), revg. on other grounds T.C. Memo. 1994-99.

In Wiksell, the Court of Appeals for the Ninth Circuit rejected the taxpayer's argument that tragedy and duress clouded

her perception.  In reaching this decision, the court noted that the taxpayer had asked her husband "why there was no income on the returns reflecting the money that  * * * [they] had been living off".  Id. at 1462.  She stated that he gave her a bizarre explanation that did not make sense to her.  Id. at 1462-1463. Prior to signing the return, the taxpayer had learned of a restraining order preventing her husband from soliciting investments, and she read an article that purportedly explained the sham her husband was involved in.  Id. at 1461.  At the very least, the court stated that the taxpayer "knew something was awry, but refused to go further."  Id. at 1463.  In light of extremely small sums of income reported, the evidence of excessive spending, and the large sums of money on hand, the court held the evidence of an understatement was overwhelming and the taxpayer could not hide from it.  Id.  In light of this overwhelming evidence, any abuse did not provide an adequate explanation for her behavior.  Id. at 1463 n.2 (citing Kistner v. Commissioner, 18 F.3d at 1526[9].

Petitioner's situation is distinguishable from the

---

[9]  In Wiksell v. Commissioner, 90 F.3d 1459, 1463 n.2 (9th Cir. 1996), revg. T.C. Memo. 1994-99, the Court of Appeals for the Ninth Circuit noted the Eleventh Circuit's holding in Kistner v. Commissioner, 18 F.3d 1521 (11th Cir. 1994), revg. and remanding T.C. Memo. 1994-463, that spousal abuse could reach a point so as to provide an adequate explanation for deference to offending spouse.  However, under the facts, the Court of Appeals for the Ninth Circuit held that the taxpayer could not hide from the overwhelming evidence and that any abuse did not provide an explanation.  Id.

taxpayer's situation in <u>Wiksell</u>.  We find that petitioner did not have reason to know about the understatement.  Petitioner did not have substantial cash on hand, did not report small sums, and did not have unusual expenditures for the years at issue.  In our case, the evidence does not show that petitioner knew or had reason to know that something was awry on the joint returns.  As a result, we find that the physical abuse by Mr. Aude is one of the factors for us to consider in explaining her deference to Mr. Aude.  See <u>Makalintal v. Commissioner</u>, T.C. Memo. 1996-9.

In <u>Estate of Brown v. Commissioner</u>, T.C. Memo. 1988-297, spousal abuse was considered as a factor.  In that case, taxpayer's husband repeatedly physically abused his wife.  <u>Id.</u> When he needed taxpayer's signature on a document, he would merely present the document and did not give her an opportunity to read it.  <u>Id.</u> Taxpayer "always complied with his demands, for fear that she would be beaten if she refused."  <u>Id.</u>  In that case, the following was emphasized:  That taxpayer's husband was primarily responsible for the operations of the business; that he told his wife almost nothing about the company's affairs; and furthermore that she was forced to sign documents in fear that she would be beaten if she did not comply with her husband's demands.  <u>Id.</u> <u>Brown</u> concluded that the taxpayer did not know or have reason to know of the income omitted from the joint returns. <u>Id.</u>

While petitioner was not coerced or physically threatened

into signing the returns, she was intimidated by Mr. Aude because she feared being physically abused if she refused. Petitioner testified that she didn't have "any right" to question Mr. Aude, and if she did, she feared she "would be physically attacked." From this, she learned that she had to skirt issues with Mr. Aude, or face his wrath. Petitioner testified that if she "had not felt intimidated by [Mr. Aude], [she] might have had the option of going through" the returns. We find this to be a factor explaining why petitioner did not review or inquire about the returns.

Considering all of the circumstances, we conclude that petitioner did not know facts that put her "on notice" of the understatement. We find that a reasonably prudent person under petitioner's circumstances, at the time of signing the returns, could not be expected to know that Mr. Aude's deductions would give rise to a substantial understatement of tax or that further investigation was warranted. Petitioner has satisfied the section 6013(e)(1)(C) requirement.

Section 6013(e)(1)(D) Equitable Considerations

The final question is whether, taking into account the facts and circumstances, it would be inequitable to hold petitioner liable for deficiencies attributable to the substantial understatements. Sec. 6013(e)(1)(D); see sec. 1.6013-5(b), Income Tax Regs. Relevant factors include significant benefits received as a result of the understatement of the spouse claiming

relief, any participation in the wrongdoing on the part of the innocent spouse, and the effect of a subsequent divorce or separation. See S. Rept. 91-1537 (1970), 1971-1 C.B. 606, 607-608.

While the text of section 6013(e) no longer requires us to determine whether a spouse significantly benefited from the erroneous item, this factor is still considered to determine whether it is inequitable to hold a spouse liable. Belk v. Commissioner, 93 T.C. 434, 440 (1989); Purcell v. Commissioner, 86 T.C. 228, 241-242 (1986), affd. 826 F.2d 470 (6th Cir. 1987). In making this determination, normal support, measured by the circumstances of the parties, is not a significant benefit. Estate of Krock v. Commissioner, 93 T.C. 672, 678 (1989); Terzian v. Commissioner, T.C. at 1172; see sec. 1.6013-5(b), Income Tax Regs. Unusual support and receipt of property, however, would constitute a significant benefit. Terzian v. Commissioner, supra at 1172; see sec. 1.6013-5(b), Income Tax Regs. During the years at issue, petitioner received a $3,000 monthly allowance to take care of the household expenses, which included taking care of five children. This amount did not increase during this time, but at times, it decreased. This normal support for household expenditures is not considered to be a significant benefit. Also, during the same period of time, petitioner's standard of living did not increase in comparison to her standard of living in prior years. She lived in the same house since 1978.

Petitioner and Mr. Aude only went on one vacation during the 3 years at issue. Their lifestyle was not lavish. We find that these expenditures amounted to normal support and did not rise to the level of unusual support.

Respondent relies on the fact that even though petitioner did not control the family wealth, she benefited by having additional funds available to help support her and her children and also benefited in the divorce settlement. In the divorce decree, tax refunds were not apportioned to petitioner, and Mr. Aude acquired the Magnum investment. Petitioner received her share of the marital assets, which included the family home, household furniture, personal effects, a station wagon, and an interest in Mr. Aude's retirement account. Also, while Mr. Aude was ordered to pay alimony to petitioner, Mr. Aude was at times in arrears. The amount of alimony, which ranged from $3,000 per month in 1983 to $2,000 per month in 1986, was not extraordinary in terms of her standard of living during the Audes' marriage. Also, the increase in child support, which ranged from $1,000 per month in 1983 to $1,500 per month in 1986 to $2,650 per month in 1989 to $1,600 per month currently, was due in part to Erik's medical costs. We do not find that petitioner significantly benefited from the tax savings attributable to the losses claimed from the Magnum investment.

In assessing the equity in holding a spouse liable under section 6013(e), we also consider the probable future hardships

that would be imposed on the spouse seeking the relief if such relief were denied.  Sanders v. United States, 509 F.2d at 171 n.16; Peterson v. Commissioner, T.C. Memo. 1997-18; Edmondson v. Commissioner, T.C. Memo. 1996-393; Petitioner offered evidence of future probable hardship if relief were denied.  Since the divorce, petitioner's standard of living has decreased.  A major factor to petitioner's hardship is the financial drain of medical costs, which arose from Erik's accident.  After selling the family home in 1988 and reinvesting in the Palmdale home, she had to refinance the home to pay Erik's medical bills.  Currently, while the Palmdale home is held as a rental property, the rental income derived from the property does not cover the mortgage on the property.  The profit-sharing fund was rolled over into an individual retirement account for the benefit of petitioner; however, this was after withdrawing funds for attorney's fees for the divorce and for medical expenses for Erik.

Since the divorce in 1983, petitioner has worked part-time. She attended college on a part-time basis from 1983 through 1985, but had to quit when Mr. Aude did not pay alimony to petitioner. In 1990, petitioner enrolled in a junior college to study computers.  Presently, petitioner and her current husband are unemployed.

Currently, Mr. Aude is financially stable, but through a bankruptcy proceeding he has been discharged of his obligation on his tax liability.  If relief were not afforded to petitioner,

she would bear the entire burden of the tax liabilities resulting from the understatement attributable to the Magnum deductions.

Considering that petitioner did not receive significant benefit from the understatements and the future probable hardship that would be imposed if relief were denied, we find that it would be inequitable to hold petitioner liable for the resulting deficiencies.  Therefore, petitioner has satisfied section 6013(e)(1)(D). In summary, we find that petitioner has established (1) that she did not know and did not have reason to know that there was a substantial understatement relating to the Magnum deductions and (2) that it is inequitable to hold her liable for the resulting deficiencies.  Taking into account the parties' stipulations, supra, we, therefore, hold that petitioner has met all of the requirements of section 6013(e), and she is entitled to relief as an innocent spouse for any income tax liability attributable to the understatements for the years in issue arising from the Magnum investment.

To reflect the foregoing,

Decisions will be entered

under Rule 155.